IN RE REMOVAL OF MAYOR LLOYD PICKERING.

(No. 1082—Decided December 29, 1970.)

*Messrs. Navarre, Rizor, Dapore & Pettit* and *Mr. Patrick Allen,* for appellant.

*Mr. James R. Goslee, III,* and *Mr. Michael F. Boller,* for appellees.

GUERNSEY, J.   This is an appeal by Lloyd Pickering from a judgment of the Probate Division of the Common Pleas Court of Logan County, Ohio, in a proceeding filed under the provisions of R. C. 733.72 *et seq.,* for his removal from the position of Mayor of the village of Russells Point. The cause was tried without intervention of a jury.   Though there were some fifteen specifications in the complaint of alleged misfeasance or malfeasance the probate judge concluded in his decision only that Pickering "failed to take precautions or exercise that care which due regard for others requires and his neglect resulted in injury, and he therefore is guilty of misfeasance and should be removed from office."

Also, notwithstanding the multiplicity of specifications in the complaint, in findings of fact filed thereafter the probate judge found merely:

"(1) That on the fourth and fifth of July, 1969, Lloyd Pickering was the duly elected and acting mayor of the Village of Russells Point, Logan County.

"(2) During the fourth and fifth of July, 1969, he was also acting as chief conservator of the peace within the Village of Russells Point, Ohio.

"(3) On the fourth and fifth of July, 1969, he appeared on the streets of Russells Point, Ohio, showing no badge of an officer or other authority, but was instead armed with a loaded shotgun and wearing a hunting vest filled with shotgun shells.

"(4) That on the days hereinbefore mentioned Lloyd Pickering did fire said shotgun between one hundred (100) and one hundred twenty times. Some of these shots were

into the air and other shots were in the direction of individuals. Lloyd Pickering did shoot at and wound in the neck, back, and buttocks one Robert Daigneault.

"(5) That during the times hereinbefore mentioned, Lloyd Pickering without authority, provocation, or excuse, did beat about the head and face a person, whose name is unknown, using the shotgun as a club to knock said youth insensible to the ground. This was more force than was necessary to effect an arrest.

"(6) That during the time hereinbefore mentioned Lloyd Pickering while in the police trailer parked behind his house did assault and strike Thomas Diener, without authority, provocation, or excuse, while the said Thomas Diener was engaged in posting a bond for a friend."

In each of those findings the reference to both the fourth and fifth of July is not a reference to two distinct events but is reference to a single continuous period of time commencing late on the evening of the fourth and extending to the early morning of the fifth.

In his journal entry of judgment removing Pickering from office, the probate judge incorporated by reference the foregoing decision and findings of fact.

Appellant's first and second assignments of error are, in essence, that the trial court committed prejudicial error in that there was no evidence that the signers of the complaint were electors of the village and thereby qualified to sign the complaint. However, we cite with approval the conclusion of the Court of Appeals for Franklin County in *In re Bostwick*, 43 Ohio App. 76, respecting the qualifications of signers of a removal complaint filed under similar provisions at G. C. 10-1, *et seq.* (now R. C. 3.07 *et seq.*). There it was determined that it is incumbent on the assailant of jurisdiction to plead and prove the disqualification of the signers. Thus the burden of such proof here was on the appellant, a burden which he did not fulfill.

The third assignment of error relates to the participation in the trial, by making objections and otherwise, of an attorney employed as private counsel for the complainants who was permitted to be present at the trial table to ad-

vise one of the complainants. R. C. 733.73 provides that the prosecution of the complaint is to be conducted by the city solicitor. While examination of the trial record demonstrates that the activities of the private attorney far exceeded the capacity in which he was permitted at the trial, the record also reveals either that the appellant failed to preserve this conduct for review by appropriate objection or that the conduct does not affirmatively appear to have prejudiced the appellant.

Appellant's fourth and fifth assignments of error are that the judgment is against the manifest weight of the evidence and contrary to law.

As the trial court did not find appellant guilty of any acts of malfeasance, our only concern is whether there was appropriate proof of acts of misfeasance. Judge Matthias said in his opinion in *U. S. F. & G. Co.* v. *Samuels,* 116 Ohio St. 586, 593: "Misfeasance has been defined as 'improper doing of an act which a person might lawfully do,' also as 'a failure to use, in the performance of a duty owing to an individual, that degree of care, skill, and diligence which the circumstances of the case reasonably demanded,' and also as 'the performance of an act in an improper manner whereby some one receives an injury.' "

In *McMillan* v. *Diehl, Judge,* 128 Ohio St. 212, 214, the Supreme Court held:

"Statutes authorizing the removal of an incumbent from office are *quasi* penal in character, and * * * removal statutes should be strictly construed and * * * the evidence sustaining the removal of an official from office should be clear and convincing. * * * "

In order then to sustain the judgment of the probate court, it must appear by clear and convincing evidence that the acts referred to in the findings of misfeasance by the Probate Court constitute acts *improperly done* by the mayor which he might have lawfully done, or failure to use, in the performance of a duty owing to the individuals named in such findings, that degree of care, skill, and diligence *which the circumstances reasonably demanded,* or the performance by him of an act *in an improper manner*

whereby some one received injury. The crux of the situation is whether Mayor Pickering performed a duty of his office or an act which he might have lawfully done in the scope of the authority of his office *in an improper manner under the circumstances.*

The Probate Court recognized, as we do, that a village mayor is the chief conservator of the peace within his village. This is not a mere conclusion from other facts but is prescribed positively by statute. R. C. 733.24. The term "conservator of the peace" is not there defined but is defined in Bouvier's Law Dictionary, Rawle's Third Revision, as "He who hath an especial charge, by virtue of his office, to see that the king's peace be kept." There are no specific provisions of law prescribing the manner in which this shall be done but the propriety of the manner is necessarily dictated by the circumstances.

Effective June 13, 1968, before the occurrences herein the Legislature enacted new laws with respect to riots and dangerous assemblies. One of these, R. C. 2923.51, provides:

"Where five or more persons are engaged in violent or tumultuous conduct which creates a clear and present danger to the safety of persons or property, *a law enforcement officer* * * * shall, forthwith upon view or as soon as may be on information, and unless prevented by such persons, order such persons to desist and disperse to their several homes or lawful employments. Such order shall be given by such means and as often as necessary to reasonably insure that it is heard unless the giving or hearing of such order is prevented by such persons. Whoever refuses or knowingly fails to obey such order shall be fined not more than fifty dollars." (Emphasis added.)

Another, R. C. 2923.55, provides:

"Police officers, special police officers, sheriffs, deputy sheriffs, highway patrolmen, *other law enforcement officers* * * * when engaged in suppressing a riot or in dispersing or apprehending rioters and after an order to desist and disperse has been issued pursuant to Section 2923.51 of the Revised Code, are guiltless for killing, maiming, or injur-

ing a rioter as a consequence of the use of such force as is necessary and proper to suppress the riot or disperse or apprehend rioters. * * * '' (Emphasis added.)

Mayor Pickering, as the chief conservator of peace within the village, had a positive duty to suppress any riot therein and to disperse and apprehend rioters. There is nothing in the law which required him to stand idly by or to merely counter the activity of the rioters. As it was his duty to suppress and disperse he was required to take aggressive measures using ''such force as is necessary and proper to suppress the riot or disperse or apprehend rioters.'' In such event, if only such force was used, he must be held guiltless for injuring any rioter as a consequence thereof, provided only, that the prescribed order to desist and disperse has been given. In this latter respect it will be noted that the statutes do not prescribe any particular form or manner in which such order be given, but merely prescribe that it ''be given by such means and as often as necessary to reasonably insure that it is heard unless the giving or hearing of such order is prevented by such persons.'' Thus, if given in one part of the village it need not necessarily be given or heard in another part and if the enforcement officer is under attack the giving of the order may be prevented by the attack. In such event he is not required to give the order before retaliation.

The third finding of fact is that ''on the fourth and fifth of July, 1969, he appeared on the streets of Russells Point, Ohio, showing no badge of an officer or other authority, but was instead armed with a loaded shotgun and wearing a hunting vest filled with shotgun shells.'' In Ohio a village mayor has no uniform or badge of office. Even at common law a private citizen, wearing no uniform, might lawfully endeavor to suppress a riot and arm himself for that purpose. 77 Corpus Juris Secundum 437, Riot, Section 29. On the evidence here, there is no doubt that conditions of riot existed at the time in question and the Mayor was justified in being dressed and armed as he was. The third finding has no probative value, either standing alone or otherwise, to show misfeasance of office on the part of the appellant.

The fourth finding of fact is "that on the days hereinbefore mentioned Lloyd Pickering did fire said shotgun between one hundred (100) and one hundred twenty times. Some of these shots were into the air and other shots were in the direction of individuals. Lloyd Pickering did shoot at and wound in the neck, back and buttocks one Robert Daigneault."

There is prolific evidence that "five or more persons" were "engaged in violent or tumultuous conduct which creates a clear and present danger to the safety of persons or property." Under these circumstances Mayor Pickering had the right, as well as the duty, to suppress such conduct and to use "such force as is necessary and proper" in doing so. When commands to disperse and tear gas proved insufficient and ineffectual to cause dispersal, as the evidence shows without dispute, the firing of a shotgun into the air was reasonable and proper. Under such circumstances firing "in the direction of" rioters would also be a reasonable and proper method of dispersal when fired at such distance or range that the rioters would not be hit. Likewise, riot guns, which are essentially short barreled and very short range shotguns used to disperse rioters without causing serious injury or death (see Websters Third New International Dictionary) and which are loaded with fine shot and a light charge, in some circumstances have been considered a proper weapon of reasonable force to fire at rioters when other means of dispersal have failed. Although there is evidence in the record that Daigneault was wounded, from which it may be inferred that Pickering's shotgun was fired in his direction at such range that he was hit, the record is silent as to the nature, location and extent of his wounds and silent as to their treatment, if any. In fact, the shirt which he claims to have been wearing and claims to have been punctured was neither offered nor admitted into evidence. In the absence of such evidence there remains no clear and convincing evidence that Daigneault suffered any serious injury and the only reasonable inference is that his wounds were merely surface and superficial. In fact, there is no evidence that Mayor Pickering fired with intent to actually hit any

rioter and there is no evidence that anyone but Daigneault was hit by any shotgun pellets.

If Daigneault was not himself a rioter, he was, at best, an innocent person who had injected himself into the mob. Although he might not have had the requisite intent or purpose, or acted in such way as to be said to have been "engaged in violent or tumultuous conduct" there is no requirement in the law that the persons charged with the duty of suppressing a riot must be so selective in their suppressive action that it be applied only to such individuals in the mob as are engaged in the activity and as have the requisite subjective animus. If in such instances a law officer must distinguish at his peril between the militant and the non-militant, under circumstances where distinction is impossible, suppression of mob activity would likewise become an impossibility.

We conclude that there is no clear and convincing evidence that Mayor Pickering used force which was excessive to the occasion. On the contrary, we conclude, as a matter of law, that Mayor Pickering conducted himself in such manner in suppressing the riot as to make him "guiltless" for injuring "a rioter," as prescribed by R. C. 2923.55, and that he was, therefore, guiltless as to any incidental injury suffered by Daigneault.

The fifth finding of fact is "that during the times hereinbefore mention [sic], Lloyd Pickering *without authority, provocation* [sic], *or excuse*, did beat about the head and face a person, whose name is unknown, using the shotgun as a club to knock said youth insensible to the ground. This was more force than was necessary to effect an arrest." (Emphasis added.)

Being an unknown person, there is no evidence as to the age of the individual involved and the conclusion that he was a "youth" must be considered in such light. There was evidence that he was a male of large build, larger than Mayor Pickering, and that the incident occurred immediately after a rock had been hurled through a window in the Mayor's home causing injury to a guest of his daughter. There was the Mayor's testimony that the person

was approaching him in a menacing manner with arm raised and a rock clenched in his hand, corroborated by a policeman's testimony that the individual was approaching the mayor with his arm raised and something in his hand. The only evidence, seemingly to the contrary, was the testimony of persons who saw the incident from a distance and who testified that they did not see anything in the individual's hand. This, of course, is negative evidence having no probative value in that these individuals were not in a position to see anything in the person's hand. Though there is evidence that he remained on the ground for a short time after being hit with the barrel of the shotgun there is no evidence that he was "insensible." Likewise, though the instrumentality used was a shotgun it was used in the same manner as would be a policeman's nightstick.

There was no evidence of probative value, let alone clear and convincing evidence, that the force used by the mayor exceeded the necessity of the circumstances, 6 Corpus Juris Secundum 954, Assault and Battery, Section 97, and we conclude, as a matter of law, that the Mayor's hitting a person in this manner whom he had reason to believe was about to assault him, did not constitute using more force than was necessary, so as to deprive him of the protection of the provisions of R. C. 2923.55.

In this connection we also wish to cite with approval the rule expressed in 6 Corpus Juris Secundum 326, Assault and Battery, Section 23, as follows:

"The officer is the judge, within reasonable limits, of the amount of force that is necessary to be used, and when he acts in good faith, the courts will ordinarily afford him the utmost protection. In determining the amount of force an officer may use in making an arrest the standard is the conduct of an ordinarily prudent man under the circumstances that the officer finds himself, but the courts will recognize the fact that emergencies arise when officers are not expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigation in court."

The sixth and last finding of fact is "that during the time hereinbefore mentioned Lloyd Pickering while in the police trailer parked behind his house did assault and strike Thomas Diener, *without authority, provacation [sic], or excuse,* while the said Thomas Diener was engaged in posting a bond for a friend." (Emphasis added.)

Reference to the record shows that the episode which is the subject of this finding had no connection with the riot hereinbefore referred to. It is also undisputed in evidence that at the time in question Diener's friend was being booked by a police sergeant, was in a drunken condition, was noisy, cursing, arguing and creating a disturbance, and that the cursing and noise had attracted Mayor Pickering to the trailer. Diener testified, among other things, "Mr. Pickering came in * * * and asked me to leave. I said, 'Just as soon as I post the bond for my friend I will.' He said, 'Leave now.' I said, 'I am not leaving until I post this bond.' and he proceeded to escort me out the door. * * * I stopped at the door. I put my hand up so they couldn't push me out and I turned around and directly looked at Mr. Pickering and stated I wasn't leaving until I posted bond and he hit me in the jaw." He also testified that at that time they were having a great deal of difficulty with his friend. Mayor Pickering testified, among other things, "I says [to Diener], 'What are you doing here?' And he didn't answer me and I turned around and right here he come again and he turned around and I just tried to shove him out the door and he throwed his hands up like that and stopped himself from going out the door, with all these people in here and it's all crowded. Anyway, I stepped back. Don had got up, or Tom, and I stepped back to say something to them, and I saw this movement and here come this guy with his hands drawn up in the form of somebody going to strike you, * * *. So I went like that, struck at him and shoved him against the trailer."

Although not then acting to suppress a riot Mayor Pickering was nevertheless, clothed with the authority and the responsibilities of the chief conservator of the peace within the village. Whether or not Diener was in the trailer with the purpose in mind of posting a bond for his

friend, Mayor Pickering had complete authority, in an effort to eliminate the confusion and quell the disturbance then existing, to ask Diener to leave the police trailer. When Diener refused to do so the mayor likewise had authority to use reasonable force to eject him from the trailer. It was only after Diener refused to leave, resisted ejection therefrom and turned with arm upraised in a posture as if to strike the mayor that the mayor, believing that he was going to be struck by Diener, himself struck Diener on the chin. Diener did not testify as to the force of the blow and the Mayor testified that he did not strike him with all his might for had he done so he "would have knocked him out clear through the trailer."

Thus, giving Diener's testimony every favorable inference, we must conclude that there is no clear and convincing evidence that Mayor Pickering, under the circumstances then existing, used either excessive force or was acting "without authority, provacation [sic], or excuse." We, therefore, conclude as a matter of law, that there was a complete failure of proof of this alleged act of misfeasance.

We have examined the other assignments of error relating to the exclusion of evidence of previous riots and character evidence and although we believe that the evidence of the experience in previous riots might have been relevant and helpful in determining the proper measure of force to be used in dispersing the rioters in the riot which was the subject matter of this case, it is not apparent, in the light of the foregoing, that either the rejection of the evidence as to previous riots or the rejection of character evidence constituted prejudicial error in bringing about the erroneous judgment entered herein by the trial court.

Finding, as a matter of law, that there was a failure of proof of each of the alleged acts of misfeasance of which he was found guilty by the court below, the judgment of that court must be reversed and vacated and this court, rendering the judgment the trial court should have rendered, finds that Mayor Pickering is not guilty of each and all of the alleged acts of misfeasance and malfeasance set forth in the complaint filed herein and judgment is rend-

70

ered in his favor dismissing the said complaint at the cost of the complainants.

*Judgment accordingly.*

COLE, P. J., and YOUNGER, J., concur.