THE STATE OF OHIO *v.* FOSTER.

(No. 78-CR-07-1621—Decided February 1, 1979.)

Court of Common Pleas of Franklin County.

*Mr. George C. Smith,* prosecuting attorney, for plaintiff.
*Mr. Harold Wonnell,* for defendant.

FAIS, J.

## I.

*Nature of the Case and Procedure to be Followed:*

This is a criminal case, and as such, it began with the filing of an indictment. Said indictment, in substance, charges the defendant with a violation of R. C. 2903.03, in that on or about the 29th day of May, 1978, while under extreme emotional stress brought on by serious provocation reasonably sufficient to incite the defendant into using deadly force, defendant knowingly caused the death of Steven A. Stokes. The crime which brings this defendant before this court is normally entitled Voluntary Manslaughter, designated a felony of the first degree.

R. C. 2903.03 provides in pertinent part:

"(A) No person, while under extreme emotional stress

brought on by serious provocation reasonably sufficient to incite him into using deadly force, shall knowingly cause the death of another."

By agreement, the assistant prosecuting attorney for Franklin County, Ohio, and counsel for the defendant have filed a written request waiving defendant's right to have his case tried by a jury. Defendant's consent to this request appears in the file. The jury waiver was accepted by the court only after careful questioning of the defendant and having fully provided him with an explanation of his rights with respect to the waiver.

In addition, when this case was brought before the court for trial, the parties and their counsel represented that a stipulation of facts had been prepared, and that the stipulation would eliminate the taking of sworn testimony and the presentation of evidence. This procedure was approved by the defendant, who stated that he understood this procedure foreclosed his right to confront and cross-examine the State's witnesses, as well as prevented him from subpoenaing witnesses in his behalf. Having established all the procedural requirements, this case proceeded as scheduled with the filing of Briefs by both parties setting forth the legal conclusions of counsel as each party views the applicable law.

## II.
### STIPULATIONS OF FACTS

At approximately 4:30 P.M. on May 29, 1978, Memorial Day, Columbus Homicide Detectives were dispatched to a shooting that had taken place at Stoney Bridge Road and Dublin Road in Franklin County, state of Ohio.

The homicide had taken place in a vehicle. This vehicle had come to rest facing northbound off Old Dublin Road on property known as 4025 Dublin Road. The front end of the vehicle was damaged extensively from striking a tree after the shooting had taken place. This vehicle is a 1971 Volkswagon Stationwagon, 2 doors, green, bearing Ohio 1978 Registration A-57811. Also, the vehicle had sustained some damage from gunshots. The right front passenger window was shattered. There was a bullet hole located approximately three to six inches at the bottom of the windshield on the passenger side of the vehicle. A bullet hole was located on

the passenger side of the vehicle in the trunk lid and which had entered on the right side and proceeded into the trunk and fire wall area. A ricochet mark appeared on the left side of the trunk. (It should be noted that the trunk of this vehicle is located in the front of the car and the engine is in the rear.)

The victim of this homicide was identified as Steven A. Stokes, male/white, 21 years of age, and residing at 92 North Haldy Avenue, Columbus. Mr. Stokes was found lying on his right side in the front seat of the vehicle on the passenger side, being a bucket seat. There was a laceration above his left eye. There was a bullet hole in the lower left neck area and an exit wound underneath the right arm in the upper right rib cage area.

The course of travel this vehicle took prior to striking the tree appeared to be in a northbound direction from the south. It had gone left of center and down an embankment approximately fifteen to twenty feet from Dublin Road coming to rest against a tree located in the front yard of 4025 Dublin Road, just off Dublin Road between Old Poste Road to the north and Hilliard-Cemetery Road to the south.

This vehicle belonged to one, Christopher Thorne, male/white, 18, who resides at 3900 Dublin Road. The Franklin County Sheriff's Office was in the process of taking a stolen automobile report from Christopher Thorne.

On May 30, 1978, an autopsy of the body of Steven A. Stokes was performed by Dr. N. Baba. The cause of death, in his opinion, was from a gunshot wound entering the left side of the victim's neck at a forty degree angle, exiting the right side of the victim's chest below the right arm. If Dr. Baba were called to testify, he would state that the final diagnoses resulting from the autopsy are: Gunshot wound of the left posterolateral neck; laceration of the heart; hemothorax left 1500 ccs. and hemopericardium, 200 ccs. Dr. Baba would further testify that his opinion is that the bullet which entered the left posterolateral neck exited under the right arm of the victim. Dr. Baba would also testify that an ethanol alcohol toxicological analysis of the victim resulted in a conclusion of 0.13%.

On Memorial Day, Steven A. Stokes was in the area of Scioto River, north of Fishinger Road Bridge. Mr. Stokes had parked his automobile north of the boat ramp and below the

hill. At this time he had met Keith E. Kirk, who states that Mr. Stokes told him that he had run out of gas. Both gentlemen were drinking alcoholic beverages and at approximately 3:50 P.M. this activity was observed by Marine Park Officer, Robert Goodwin, Badge No. 7.

Sgt. Goodwin parked his cruiser and walked toward the subjects. As he did so, Mr. Stokes set his beer can down in the rear of his auto, a 1975 Chevrolet Vega, cream colored hatch back, bearing Ohio License No. 82201. Sgt. Goodwin then observed Mr. Stokes go north of the area of the car and mingle in the crowd. When he arrived at the vehicle and found a can of Pabst Blue Ribbon Beer in the back of the vehicle, he picked it up and was at that point approached by one, Michael Manoco, of 1980 Sullivant Avenue, male/white, twenty (20), who said that it was his beer and he would take the blame. When Sgt. Goodwin requested identification of Manoco, Manoco gave him a California driver's license. Sgt. Goodwin then asked for additional identification and as Manoco started to give Sgt. Goodwin a social security card, Mr. Stokes, who had been observed drinking beer, came from Sgt. Goodwin's blind side and grabbed the beer can from Sgt. Goodwin's hand. (It was later determined that Manoco's true name is Keith Kirk, who resides at 442 Nashoba in Columbus, Ohio.) It was at this point that Sgt. Goodwin returned to his cruiser and called Officer Foster for assistance. He then started back to the subject vehicle and observed the subject standing by a group of people. As Sgt. Goodwin approached, the subject began running in a northwesterly direction toward the river. Sgt. Goodwin then called Officer Foster again.

Prior to the first call of Sgt. Goodwin, Officer Louis Foster was in the process of issuing a traffic citation to one, Leslie B. Jacob, charging her with a violation of the Columbus Traffic Code, Section 919.06, Obstructing a Roadway. While Leslie Jacob was in the cruiser of Officer Foster, Officer Foster received a radio signal from his superior, R. H. Goodwin, who was acting sergeant at the time. Sgt. Goodwin was located in the area referred to as "the hole," which is immediately north of the first entrance to the park, north of Fishinger Road bridge on the west side of the roadway that runs parallel to the U. S. Route 33 and the east bank of the

Scioto River. A landmark of this area is a swale or small valleylike area, which on this particular day was occupied by numerous people engaged in various activities.

The first radio message received by Officer Foster from Sgt. Goodwin was; "Could you get out here? I need help." Foster replied that he was writing a citation and would be there; "In a minute." After a brief interval, Officer Foster again received a radio message from Sgt. Goodwin; "You better hurry! Make it quick! I need help! Some guy just pulled a beer can out of my hand." Officer Foster said; "I'll be right there." Officer Foster then jumped out of the cruiser, opened the door for Ms. Jacob, handed her a ticket and made ready to assist his Sergeant.

Sgt. Goodwin then began a chase of Mr. Stokes by cruiser and was soon joined by Officer Foster. Mr. Stokes ran to the river's edge and disappeared. Both Sgt. Goodwin and Officer Foster began a search of the bushes at the east bank of the river. Unable to locate Mr. Stokes, Sgt. Goodwin advised the river patrol boat by radio of the situation confronting him. Shortly thereafter, Sgt. Goodwin and Officer Foster observed the subject swimming in a westerly direction across the Scioto River. Sgt. Goodwin also observed a boat in the river in the general vicinity of the swimming subject and advised the people in the boat to pick the subject up and bring him to shore. Mr. Stokes refused to enter the boat and continued swimming, refusing to go aboard a second boat which appeared at the scene.

When Mr. Stokes was nearing the west bank in the vicinity of a boat dock, and about thirty or forty feet from the west bank, the police patrol boat was positioned by other officers between Mr. Stokes and the west bank. Mr. Stokes swam around the patrol boat to the boat dock, emerged from the river and fled into the woods on the west bank. These actions on the part of Mr. Stokes were observed by Officer Foster. Sgt. Goodwin returned to his cruiser and ran a registration check of Ohio License No. 82201, learning that the vehicle was registered to Robert L. Stokes, 92 North Haldy Avenue, Columbus, Ohio. Sgt Goodwin then requested a wrecker.

After Officer Foster observed the subject emerge from the river on the west bank and disappear into the woods, he noted the location and entered his cruiser, proceeded over the

Fishinger River bridge to Dublin Road, turned north and proceeded to Carriage Lane, a private drive, running in an east-west direction between Dublin Road and the west bank of the river. Some distance down Carriage Lane headed toward the west bank of the river, Officer Foster stopped his cruiser and got out. At this juncture, he saw Mr. Stokes run up the hill from the river toward his location. The subject was running due west and veered sharply at a right angle and began running north across private property and between residential dwellings. Officer Foster, with night stick in hand, gave chase and caught up with the subject at the intersection of Old Poste Road and Old Poste Lane. Officer Foster advised the subject that he was under arrest and he was going to jail and took his cuffs from his belt and attempted to handcuff Mr. Stokes. Mr. Stokes said that he was not going with the officer and kept pulling his hands away from Officer Foster. Mr. Stokes did not strike Officer Foster. Officer Foster, using his night stick, leveled Mr. Stokes to the ground. Once again the officer attempted to place handcuffs on Mr. Stokes and once again Mr. Stokes resisted. Squirming free, Mr. Stokes arose and ran west on Old Poste Road to the intersection of Dublin Road with Officer Foster chasing him on foot.

Mr. Stokes then turned left and continued to run in a southerly direction on the berm along the west side of Dublin Road with Officer Foster in pursuit. At a point north of Hilliard-Cemetery Road where it intersects with Dublin Road, when Mr. Stokes was a few feet in front of Officer Foster, the latter threw his night stick at the subject in an additional effort to stop him. The night stick did not hit the subject. The chase continued along the berm of the west side of Dublin Road and the subject stopped a passing vehicle momentarily but the stopped vehicle continued south. Officer Foster observed the subject attempt to stop two other vehicles without success. During this chase the officer endeavored on several occassions to raise help by walkie-talkie. Shortly after Mr. Stokes and Officer Foster proceeded south of the intersection of Hilliard-Cemetery Road and Dublin Road, Mr. Stokes left the berm of the west side of the road and headed east to the center of Dublin Road and into the northbound traffic lane.

Christopher Thorne of 3900 Dublin Road was stopped at

the intersection of Dublin Road and Stoney Bridge, a thoroughfare that runs east off of Dublin Road, while operating a green 1971 Volkswagon Squareback automobile, Ohio License No. A-57811. Christopher Thorne intended to turn right on Stoney Bridge. Mr. Stokes ran up to Mr. Thorne's vehicle, pulled open the driver's door and said; "I need a ride." Thorne asked, "Why?" The subject stated; "The police are after me." Thorne answered; "No way," whereupon the subject entered the automobile driven by Thorne. Mr. Stokes entered the vehicle by getting on top of Mr. Thorne who was still seated in the driver's seat. At that time, Mr. Thorne moved into the passenger's side of the car and as he did, he observed Officer Foster on the paved portion of the roadway in the northbound traffic lane of Dublin Road. Officer Foster was removing his service revolver from his holster and was some ten to fifteen yards away. When Thorne saw Foster point his weapon at the vehicle, Thorne emerged from the right side of his vehicle to a shallow ditch along the side of the road. From this vantage point, he observed Mr. Stokes endeavoring to put the car in gear without depressing the clutch. Being concerned over the transmission of his automobile, Mr. Thorne yelled at the subject to depress the clutch. The Volkswagon of Thorne then began to proceed in the direction of Officer Foster on the roadway. Officer Foster, armed with a Smith and Wesson, Model 10, .38 caliber revolver, discharged five rounds of the six available rounds as the car proceeded toward and past him. Two of the rounds discharged, struck the front of Thorne's automobile with one of them ricocheting off the hood into the windshield which shattered the windshield. After the first two shots, Mr. Stokes was observed bending down toward the passenger's side. As the Thorne vehicle continued toward Officer Foster, Officer Foster kept from being struck by the vehicle by moving to the east side of Dublin Road where he continued to fire three more shots. One of those rounds shattered the passenger's window and another went through the windshield. The fifth round discharged by Officer Foster is unaccounted for with respect to any markings on the Thorne vehicle.

Eventually, at a point some distance north of Hilliard-Cemetery Road, the Thorne vehicle went left of center, then

off the left side of the roadway striking a guard rail, proceeding through some bushes and striking a tree located on private property, head on, where it came to rest.

### III.
### ADDENDUM TO STIPULATION OF FACTS

It is further stipulated by and between counsel for the State and Louis Foster that:

1. Louis Foster was on duty as a Marine Park Policeman of the City of Columbus, Ohio, during his assigned duty hours at all times herein pertinent.

2. The events which took place in the park and the river occurred within the confines of Griggs Dam Park, a park owned and operated by the City of Columbus, Ohio and Scioto River, a reservoir owned by the City of Columbus, Ohio, as referred to in Section 1911.02 of the Columbus Municipal Code.

3. The events which occurred on Old Dublin Road and west of the Scioto River, including the events at Old Poste Road and Old Poste Lane, are outside the City of Columbus, Ohio, but within the confines of Franklin County, Ohio.

### IV.
### LEGEND OF EXHIBITS

*Exhibit 1*  is a diagram prepared by the Columbus Police Department portraying Dublin Road from Stoney Bridge Road to Old Poste Road reflecting also the intersection of Hillard-Cemetery Road.

*Exhibit 2*  is a diagram prepared by the Columbus Police Department portraying the area between Riverside Drive and that part of Dublin Road portrayed in Exhibit 1.

*Exhibit 3*  is composed of 42 photographs.

*Exhibit 3-1*  is an aerial photograph showing a part of Riverside Drive, an entrance way to the city park, part of the park area and part of the Scioto River with the camera pointed in a southwest direction.

*Exhibit 3-2*  is a view from above the west bank of the Scioto River looking east which includes the area in Exhibit 3-1.

*Exhibit 3-3*  is an east view of the Scioto River with the east

bank at the top of the photograph and the west bank at the bottom.

*Exhibit 3-4*  is a view of the Scioto River looking west with part of the park in the foreground and the west bank of the river in the background.

*Exhibit 3-5*  is taken on the ground from the east bank of the Scioto River in the park and shows the river and a boat dock on the west bank where Steven Stokes emerged from the water after swimming the river.

*Exhibit 3-6*  is an aerial view of Old Dublin Road depicting the intersection of Dublin and Old Poste Roads. The view is from north to south.

*Exhibit 3-7*  is an aerial view of Old Dublin Road depicting the intersection of Dublin and Old Poste Roads. The view is from east to west.

*Exhibit 3-8*  is an aerial photograph from north to south on Dublin Road showing the intersections of Old Poste Road and Hilliard-Cemetery Road.

*Exhibit 3-9*  is an aerial view looking north on Dublin Road from a point just above Hilliard-Cemetery and Dublin Roads.

*Exhibit 3-10*  is an aerial view from southwest to northeast above the intersection of Old Poste and Dublin Roads.

*Exhibit 3-11*  is an aerial photograph taken just east of Dublin Road south of the intersection of Old Poste Road from an east to west position showing, on the extreme right, a residence known as 4025 Dublin Road and trees in the front of that house where the Thorne vehicle came to rest.

*Exhibit 3-12*  is a ground view of Dublin Road from a north to south direction taken on the pavement of Dublin Road at a point north of Hilliard-Cemetery Road.

*Exhibit 3-13*  is a ground photograph of Dublin Road from south to north taken from a point south of 4025 Dublin Road.

*Exhibit 3-14*  is a view of the Thorne Volkswagon where it came to rest and taken in a southwest direction.

*Exhibit 3-15*  is a northwest view showing the guard rail struck by the Thorne vehicle before it came to rest and the rear of the vehicle at rest.

*Exhibit 3-16*   is a view facing northwest of the Thorne Volkswagon at rest between a bush and a tree.

*Exhibit 3-17*   is a southwest view of the front end of the Thorne Volkswagon.

*Exhibit 3-18*   is a west view of the right side of the Thorne Volkswagon.

*Exhibit 3-19*   is a close-up of the shattered passenger's side window of the Thorne Volkswagon.

*Exhibit 3-20*   is a southwest close-up view of the windshield of the Thorne Volkswagon.

*Exhibit 3-21*   is a southwest close-up view of the front half of the Thorne Volkswagon.

*Exhibit 3-22*   is a southwest close-up view of the crumpled trunk lid of the Thorne Volkswagon showing a bullet hole.

*Exhibit 3-23*   is a front end view of the Thorne Volkswagon showing a ricochet mark.

*Exhibit 3-24*   is a close-up of Exhibit 3-23.

*Exhibit 3-25*   is a southeast view of the front end of the Thorne Volkswagon.

*Exhibit 3-26*   is a close-up view of the interior of the Thorne Volkswagon showing the face of the steering column.

*Exhibit 3-27*   is a close-up view of the Thorne Volkswagon fire wall showing a bullet hole.

*Exhibit 3-28*   is a southeast view of the left rear portion of the Thorne Volkswagon reflecting scrape marks where it hit the guard rail before going completely off the road.

*Exhibit 3-29*   is a general view of the front interior of the Thorne Volkswagon with the passenger door open showing the victim on the front seat.

*Exhibit 3-30*   is a close-up showing a portion of Exhibit 3-29.

*Exhibit 3-31*   is a view of the front interior of the Thorne Volkswagon with the driver's door open showing the left side and lower portion of the victim.

*Exhibit 3-32*   is a morgue photograph of the upper torso, arms and head of the victim.

*Exhibit 3-33*   is a morgue photograph of the head of the victim.

*Exhibit 3-34*   is a morgue photograph of the left posterolateral neck of the victim.

*Exhibit 3-35*  is a morgue photograph of the right side of the victim's torso.

*Exhibit 3-36*  is a morgue photograph and is another view of the right side of the torso of the victim.

*Exhibit 3-37*  is a morgue photograph and is another view of the right side of the upper torso and head of the victim.

*Exhibit 3-38*  is a close-up photograph of the right upper thigh of the victim.

*Exhibit 3-39*  is a ground level photograph taken in Griggs Dam Park south to north showing the front end of the Stokes 1975 Chevrolet Vega, Ohio License No. 82201.

*Exhibit 3-40*  is a north to south view of the rear end of the Stokes Vega with the hatch back open.

*Exhibit 3-41*  is an east to west view of the Stokes Vega with the Scioto River in the background.

*Exhibit 3-42*  is a close-up view of a brown leather briefcase in the rear of the Stokes 1975 Chevrolet Vega showing eight (8) hypodermic syringes and a spoon being removed from the leather briefcase in the rear of said vehicle.

## V.
## THE DUTY OF THE COURT

The court sits as the trier of the facts. The defendant is presumed innocent until his guilt is established beyond a reasonable doubt. The court must consider all the evidence, both direct and circumstantial, and weigh such evidence as it relates to the essential elements of the crime charged in the indictment.

The defendant is charged with voluntary manslaughter, and the state of Ohio must prove beyond a reasonable doubt:

That, Steven A. Stokes was a living person and that his death was caused by the defendant in Franklin County, Ohio, on or about the 29th day of May, 1978.

That, the killing was done knowingly.

And that the act causing death was performed while the defendant was under extreme emotional stress brought on by serious provocation reasonably sufficient to incite him into using deadly force.

That, deadly force means any force which carries a substantial risk that it will proximately result in the death of any person.

Proximate cause is an essential element of the offense charged, and proximate cause is an act or omission which in a natural and continuous sequence directly produces the death and without which it would not have occurred.

Proximate cause exists when the death is the natural and probable result of the act or omission.

There may be more than one proximate cause: however, if an act or omission of the defendant was one of the proximate causes, the existence of other causes is not a defense in this case.

The court must also consider whether the defendant acted knowingly:

A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or he is aware that his conduct will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

Since one cannot look into the mind of another, knowingly is determined from all the facts and circumstances in evidence.

The emotional stress or condition must be extreme. That is, it must be great in nature and intensity; and it must exist at the time of the act or acts that caused the death of Steven A. Stokes.

However, to constitute voluntary manslaughter the extreme emotional stress must be brought on by serious provocation.

Provocation, to be serious, must be reasonably sufficient to bring on extreme emotional stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force the Court must consider the emotional and mental state of this defendant and the conditions and circumstances that surrounded him at the time.

When a person knowingly kills another while under extreme emotional stress, brought on by serious provocation, reasonably sufficient to cause him to use deadly force to kill another, then such killing was voluntary manslaughter.

If the emotional stress was not extreme, or if such stress was not present at the time of the act, or if the provocation

was not reasonably sufficient to cause the defendant to use deadly force to knowingly kill Steven A. Stokes then such killing was not voluntary manslaughter.

This is the law to be applied to the facts presented to the court by the stipulation.

In addition, defenses have been raised by counsel for defendant as follows:

"1. The homicide is justified and privileged since Louis Foster was a law enforcement officer and he was effecting the arrest of a fleeing felon.

2. The victim met his death as Louis Foster was defending himself as the victim drove a motor vehicle at him on a public highway.

3. Louis Foster was preventing the taking of private property of another by force."

The court addresses these defenses as well as the legal question of "hot" or "fresh" pursuit as it relates to the question of the defendant's authority to arrest beyond the park grounds. In other words, did the defendant over extend his authority in pursuing the victim?

## VI.
### CONCLUSIONS OF LAW

A. *"Hot" or "fresh" pursuit.*

There is no need to recite facts on this point. The defendant was confronted with two alternatives, either do nothing and completely ignore the fact of the commission of crimes in the park grounds, or proceed to apprehend the victim after he left the officer's designated jurisdiction.

The defendant chose the second alternative. His pursuit was fresh, continuous and uninterrupted. The fact that he (defendant) was in pursuit of a person who had committed a crime or crimes in the park area justifies the rationale of the Court's decision that the defendant's "fresh" pursuit extended his authority to act beyond his original jurisdiction.

It is nowhere denied that the defendant was outside of his geographical territory at the time in question.

A definition of "fresh pursuit" is clearly stated in R. C. 2935.29:

"(A) 'Fresh pursuit' includes fresh pursuit as defined by the common law, and also the pursuit of a person who has

committed a felony or who is reasonably suspected of having committed a felony. It includes the pursuit of a person suspected of having committed a supposed felony, though no felony has actually been committed, if there is reasonable grounds for believing that a felony has been committed. Fresh pursuit does not necessarily imply instant pursuit, but pursuit without unreasonable delay."

The effective date of this statute was October 1, 1953, and no changes have been made in its language.

"Fresh pursuit" is imbedded in the common law and codified by R. C. 2935.29. Under the common law the pursuit had to be "fresh and immediate." The offender could be arrested under this doctrine of common law where the officer possessed no warrant. *State* v. *Marshall* (1952), 61 Ohio Law Abs. 568.

Defendant herein acted, in the opinion of this court, within the scope, purview and authority of R. C. 2935.29.

Also, see *State* v. *Anderson* (1976), 46 Ohio St. 2d 219, affirming the judgment (conviction of defendant) of the Butler County Court of Appeals, where the officer made his arrest outside his jurisdictional boundary even though no crime had been committed by the defendant within the officer's geographical territory. A conviction followed the arrest, which was challenged in the appeals court and the supreme court. The arrest of the officer was upheld, and "fresh" pursuit by the officer, according to the Court, is the rationale which extends the officer's right to arrest beyond municipal boundaries. Footnote 1 at page 221 should be noted.

Accordingly, the court finds that the defendant herein was at all times acting within the scope of his authority under the doctrine of "fresh" pursuit, and the defendant's acts beyond the park area were lawful.

B. *Use of deadly force to effect an arrest.*

The use or misuse of deadly force to effect an arrest by a private citizen or a law enforcement officer has been, and continues to be, the subject of much discussion and judicial interpretation.

To date, twenty-four states have codified the common law principles on this legal subject, but Ohio is not one of the twenty-four states with such a statute.

Even where states have enacted a statute, attempting to

clarify the general rule established by common law, the courts have not been consistent in their conclusions as to the full force and effect of the statute. Modification and clarification by legislatures must still stand the test of judicial interpretation. Research on the subject reveals that the common law rule has not been isolated from criticism nor has it been granted immunity from change or modification.

We are concerned, and dealing with, a fundamental human right, that of the right to life. Due process and equal protection are recognized principles and guardians of this fundamental right. In addition, we are aware of the interest and protection of society and the community as it relates to the subject; that is, the health, safety and welfare of the state and the property and lives of its citizens.

There must, and should, be a proper balance established to protect the individual's rights on the one side, and the rights of the state and its citizens on the other. We emphasize in this decision a common concern for both the individual rights and the rights of the state.

What then is the common law rule as it applies to the use of deadly force by an officer whose sworn duty is to uphold the law?

The rule which developed at common law privileges a law enforcement officer in the use of deadly force when such force is necessary to secure the arrest of a felony suspect. Deadly force under common law, cannot be used however too secure the arrest of a person committing a misdemeanor. *Jones* v. *Marshall* (C.A. 2, 1975), 528 F. 2d 132; *Reese* v. *Seattle* (1972), 81 Wash. 2d. 374, 503 P. 2d 64; *Martyn* v. *Donlin* (1964), 151 Conn. 402; 198 A. 2d 700; *Union Indem. Co.* v. *Webster* (1928), 218 Ala. 468, 118 So. 794.

The justification for the common law rule is generally noted as a need to protect the public from crime. *Wiley* v. *Memphis Police Department* (C.A. 6, 1977), 548 F. 2d 1247. Also, the offender's resistance of public authority is given in support of the rule. 2 Hale, History of Pleas of the Crown, 85-86 (1788).

Judicial and legislative efforts have not relieved the confusion to any extent which now exists in the law. Legislative efforts are continually being directed to mitigate the "harshness" of the common law.

Seven states by statute modify the common law by specifying the felonies for which deadly force may be used to effect an arrest. In several states only "forcible felonies" justify the use of deadly force.

The American Law Institute approves of a modification of the common law in permitting the use of deadly force only when the crime for which the arrest is made involves conduct including the use or threatened use of deadly force, or where there is a substantial risk that the person sought to be arrested will cause death or serious bodily harm if his arrest is delayed.

It can be stated that universally the use of deadly force will be privileged only if necessary. There must be no other way to accomplish the arrest. The question is whether under *all* the circumstances the shooting was necessary. Some courts have drawn the line where the question to be decided is - Is the use of deadly force "apparently necessary" or "actually necessary?" *Martyn* v. *Donlin, supra; Union Indem. Co.* v. *Webster, supra; Mylett's Admr.* v. *Burnley* (1915), 163 Ky. 277, 173 S.W. 759. The question of the necessity for the shooting is a question of fact for the jury. These are fine distinctions, but they are important in the development of case and statutory law.

The majority view today requires only "apparent necessity." The majority rule also holds that in order for the use of deadly force to be privileged, the person sought to be arrested must be a "felon in fact." The person being sought must have in fact committed a felony. This is an important change from the common law where "suspicion" of a felony was sufficient. There is a minority rule that finds a police officer privileged if he "reasonably suspects" the person to be a felon. *Reese* v. *Seattle, supra.* A reasonable mistake will protect the officer under this less recognized rule, however, it is criticized as being unfair and unproductive of vigorous law enforcement. Perkins on Criminal Law (2d Ed. 1969), 933.

Alternatives to the common law rule have therefore been noted, and the confusion persists. The competing public policies, as mentioned earlier, leaves the answer to the legislature who must take the first step.

Ohio has no statute, and even if it did, the force and effect of any statute would be the subject of many constitutional

challenges. Any statute on the subject must necessarily strike a balance for specific and individual right to life as well as effective law enforcement, apprehension of criminals, the prevention of crime and the protection of the people in the community—recognizing that the people in the community also possess a right to life.

This is not to say that our Ohio Legislature has not put forth considerable effort to codify the Ohio case law on the use of deadly force. In 1974 a proposed R. C. 2901.37 to the Criminal Code failed to secure approval.

The proposed statute was an attempt to codify, with some modification and clarification, the Ohio case law. The statute covered the use of deadly force in preventing crime and apprehending offenders, by requiring that the arrestor have "probable cause" to believe that deadly force was necessary to accomplish the arrest or apprehend a person. It is interesting to note the provision contained in our proposed Ohio statute:

"(B) A person is justified in using force, including deadly force, when and to the extent he has probable cause to believe that such force is necessary to do any of the following:
"* * *

"(2) prevent or halt a felony about to be or being committed, or apprehend a person who is committing or has committed a felony:"

It is apparent that those who drafted the statute had closely examined the Ohio case law.

For a general statement on the status of the law in Ohio it is well to observe the following:

"It is a general rule that an officer has no right to shoot a person to effect his arrest for the commission of a misdemeanor, or to prevent his escape when arrested. But it has been held that an officer acted reasonably, as a matter of law, when he used deadly force to prevent the escape of a felon from the scene of the felony. Moreover, an officer may be justified in shooting as a matter of self-defense, where he has reasonable cause for believing that he is in danger of his life or safety." Ohio Jurisprudence 3d, Interim Topics, 1, Arrest, Section 51; citing *Jones* v. *Penketh* (1931), 31 NP, (NS) 161; *Clark* v. *Carney* (1942), 71 Ohio App. 14, 36 Ohio Law Abs. 68, 42 N.E. 2d 938.

In *Jones, supra,* decided by the Common Pleas Court of Hamilton County, the court stated, at page 162:

"Under the law of this state an officer is not only authorized to arrest an individual committing a felony in his presence, but it is his sworn duty so to do, and in making such an arrest he may use such force as is necessary to overcome the resistance of the accused, even to the taking of his life."

The court's additional conclusion, at page 163, states what appears to be the Ohio law:

"The state commands the officer to arrest those committing felonies in his presence and likewise clothes the officer with every safeguard. The fact that the original arrest was for a misdemeanor would not give the accused the right while in the custody of the officer to commit felonies with impunity."

In *Clark, supra,* decided in 1942 by the Court of Appeals for Hamilton County, the officer (defendant) was ordered by radio at police headquarters to investigate a burglary in progress in a bakery. Four men fled from the scene and the defendant shot and killed one of the offenders and wounded a second. In entering judgment for the defendant police officer in the action brought to recover damages for the death of plaintiff's husband, the court emphasized the duty of a police officer:

"The statute law of this state makes it a mandatory duty upon the police officer to arrest a person found violating the law of the state." *Id.,* at page 16.

Concluding its decision, the Court added:

"A more typical case of proper means to apprehend men who were admittedly committing a felony and fleeing from arrest can hardly be imagined. If police under such circumstances may not employ the limit of force, then the law befriends the criminal, encourages him to flee from his crimes, and insures him protection if he is injured while seeking to evade the consequences of his evil doings. Such cannot be the law." *Id.,* at page 17.

Reviewing briefly other Ohio cases relating to the use of force: In *Greger* v. *State* (1927), 27 Ohio App. 272, the son came upon his father who was being attacked by a man with a knife. The son came upon the incident after the fight with his father and the other man began. There was some evidence

that the son's father started the fight. The court recognized that a person can come to the defense of another person and even kill an assailant in the necessary defense of the other person.

See, also, *State* v. *Peacock* (1883), 40 Ohio St. 333, where the court cites *Marts* v. *State* (1875), 26 Ohio St. 162, and holds:

"Where one is assaulted in his home, or the home itself is attacked, he may use such means as are *necessary* to repel the assailant from the house, or to prevent his forcible entry, or material injury to his home, even to the taking of life. But a homicide in such a case would not be justifiable unless the slayer, in the careful and proper use of his faculties, *bona fide believes,* and has reasonable ground to believe that the killing *is* necessary to repel the assailant or prevent his forcible entry."

In *In re Removal of Pickering* (1970), 25 Ohio App. 2d 58, 266 N.E. 2d 248, the mayor, in an attempt to disperse a riot, had used tear gas which proved insufficient; he then took a shotgun loaded with birdshot and fired it into the air toward the direction of the rioters but not with the intent to actually hit any rioter or at a range that such would probably occur. One person was superficially wounded. This act was not clear and convincing evidence that the force used was more than necessary and proper to suppress the riot or disperse or apprehend the rioters. Moreover, the court held that a public officer with authority to quell a riot is not required to pick and choose between the innocent and the guilty when their identity is not apparent.

"The officer is the judge, within reasonable limits, of the amount of force that is necessary to be used, and when he acts in good faith, the courts will ordinarily afford him the utmost protection. The standard is the conduct of an ordinarily prudent man under the circumstances in which the officer finds himself, but the courts will recognize the fact that emergencies arise when officers are not expected to exercise that cool and deliberate judgment which is exercised upon hindsight after the emergency is over." Paragraph 6 of the syllabus of the court, citing 6 C.J.S. Assault and Battery, Section 23, page 826.

In *State* v. *Sells* (1939), 30 Ohio Law Abs. 355, an officer

arrested a man for improper parking and reckless operation when he drove diagonally over to a curb and parked the wrong way. While walking to the police station, an altercation occurred. The officer Sells struck the man once with his blackjack and then several other times. The officer with Sells also struck the man with his mace. The evidence showed that the man was struck at least 10 times or more.

The court found in the *Sells* case that the force used was excessive and unnecessary to accomplish the arrest. There was no excuse for the second officer's striking the man.

The court cites the law under 6 C.J.S., at page 825 as:

"A peace officer duly empowered is not liable for injuries inflicted by him in the use of reasonably necessary force to preserve the peace and maintain order, or to overcome resistance to his authority. Thus, an officer making an arrest is justified in using sufficient force to subdue the prisoner although not acting in self defense. However, if unnecessary violence is used by the officer in accomplishing his purpose,***or if he assaults the person whom he is arresting without just cause or excuse, especially after resistance to his authority ceases,***he loses the protection of the law."

See *Graham* v. *State* (1918), 98 Ohio St. 77, where the guards of a plant premises were approached by a mob and Graham shot an individual. The court stated under the facts detailed, if the defendant did not provoke the assault, but while in the lawful pursuit of his business was suddenly and violently assaulted with a deadly weapon and placed in danger of loss of life or great bodily harm, under the current or modern authority, he was not required to retreat.

Finally, in *Young* v. *Kelly* (1938), 27 Ohio Law Abs. 593, a sheriff who, while pursuing an escaping misdemeanant, fired a revolver solely to frighten him into stopping, but hit another person on the street, the court held that the defendant committed an act of trespass against the person shot and was liable for the resultant damages.

In the absence of any statutory enactments the decision announced by this court in the instant case on the question of the use of excessive or deadly force must respond to, and be consistent with, the case law cited. This court has carefully examined and considered the facts and circumstances confronting the defendant at approximately 4:30 P.M. on May

29, 1978. The stipulation of facts, the exhibits and inferences made from this direct evidence are decisive and controlling.

Felonies committed by the victim in the sight of the defendant (robbery, a theft offense; kidnapping; abduction, and escape) are detailed in the stipulation. Consideration must also be given to the fact that the victim directed a moving automobile toward the defendant. An automobile under certain circumstances has been classified as a deadly weapon. See *State* v. *Orlett* (1975), 44 Ohio Misc. 7, paragraph two of the syllabus:

"2. An automobile, when used in a manner likely to produce death or great bodily harm, can be classified as a 'deadly weapon,' under R. C. 2903.11 (A) (2) and the definition stated in R. C. 2923.11 (A)."

The facts demonstrate that the victim was in the act of committing a felonious assault upon the defendant immediately prior to the defendant's use of force. There is a clear showing of this situation in the stipulation.

In summary, the defendant's legal position as a law enforcement officer appears to be:

(1) An officer has a duty to arrest. He is given power to accomplish that purpose.

(2) The law also protects him while exercising his duty.

(3) His duty is to overcome all resistance.

(4) He must act in order to bring the party under physical restraint.

(5) But, he must use means commensurate with his purpose.

(6) He must use no more force than is reasonably necessary for the purpose.

(7) If he uses more force than necessary to make an arrest and in protecting himself, he becomes a trespasser or an assailant, thereby subjecting himself to liability for civil damages and criminal charges, under misdemeanor and felony statutes.

(8) He may use sufficient force to subdue a person, even though he is not acting in self defense.

(9) It (force) is not limited to that which permits him to protect himself, but the force extends to that which is necessary to effect the arrest.

(10) The question of whether excessive force was used in making an arrest is a question of fact for the Court.

(11) An officer may act in self-defense, when his life is in danger.

(12) Shooting in self-defense is justified, when an attempt is made to endanger the officer's life.

These guidelines are manifested in the cases decided previously by the courts in Ohio.

## VII.
### *VERDICT*

The state of Ohio having failed to prove each and every material ingredient of the offense charged, by that degree of proof required by law, this court after deliberate reflection hereby renders its verdict accordingly:

The court finds the defendant *not guilty* of voluntary manslaughter and *not guilty* of any lesser included offense. This case is, therefore, dismissed.

*Case dismissed.*