Raymond HAISLAH, Plaintiff-Appellant,

v.

Albert WALTON and City of Cleveland and Cleveland Police Department, Defendants-Appellees.

No. 79–3440.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 13, 1982.

Decided April 21, 1982.

Roger D. Heller, Christopher D. Stanley, Cleveland, Ohio, for plaintiff-appellant.

John S. Polito, Donald F. Black, Cleveland, Ohio, for defendants-appellees.

Before EDWARDS, Chief Judge, and KENNEDY and JONES, Circuit Judges.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

This appeal involves an action brought by plaintiff Raymond Haislah under 42 U.S.C. § 1983 (1976) against a Cleveland police officer (Walton) and the City of Cleveland, its Police Department and its former Police Chief Adhrens alleging that defendants violated his constitutional rights by shooting him "in the mid portion of the back." At the time Haislah was fleeing after breaking away from arrest.

Section 1983 was adopted in 1871[1] and provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

---

1. Civil Rights Act of 1871, § 1, 17 Stat. 13 (1871). The provisions relating to the District of Columbia were added in 1979. Pub.L. No. 96–170, § 1, 93 Stat. 1284 (1979).

## I. STATEMENT OF FACTS

On October 15, 1977, four Cleveland Police Officers responded to a radio dispatch occasioned by a phone call near midnight from plaintiff's mother who told a police dispatcher that her husband and her son were in an argument involving "guns and knives." Four officers and two police cars responded to the residence concerned. The officers were met at the door by plaintiff Haislah who went out on the porch to talk with them. Two officers (Popovich and Musarra) went into the house to talk with plaintiff's mother and father while defendant Walton and his female partner, Lucas, remained on the porch with plaintiff.

Plaintiff was searched[2] and then was asked by defendant about the nature of the altercation between him and his father. When defendant's questions began to suggest that the Haislah home wasn't big enough for both plaintiff and his father, plaintiff, according to defendant, forcefully disagreed and punctuated his disagreement with a vulgarity. This prompted his arrest for disorderly conduct.

Plaintiff was taken into custody on the porch and led down the front steps, flanked by Officer Lucas and defendant. As the threesome neared the last step, plaintiff broke his right arm free of Lucas' grip and punched defendant in the eye. Free of both officers, plaintiff ran, and defendant took up immediate pursuit.

From this point on, plaintiff's testimony and defendant's diverge much more materially.

Plaintiff averred that he was shot while running away from defendant:

A. And then as I was running, I turned and looked once for a second, and then I kept on running, and then he shot at me and shot me.

Q. O.K.

When you say you "looked," what do you mean?

A. I turned my head.

Q. As you were running?

A. Yes.

Q. What did you see?

A. Then I see Walton. He was on the curb.

Q. What was he doing?

A. He had his revolver out, I guess.

Q. And you said then he shot you?

A. Yes.

Plaintiff denied having any article in his hand during this episode, but he did confirm that a bandage was on his hand.

Defendant asserted that the shooting was defensive. He testified that he had commanded plaintiff to " 'Halt' or 'Freeze.' " What happened next was related by defendant as follows:

Q. Did Mr. Haislah halt or freeze?

A. No, he did not. He continued to run.

Q. What did he do?

A. I am sorry—what is the question?

Q. What did he do as you pursued him?

A. There came a point in time when he stopped and made a half turn with his arm cocked above his head.

Q. At any time prior to the time that Mr. Haislah stopped and turned with his arm cocked over his head, did you draw your revolver?

A. No. Up until that happened, I did not have my revolver drawn.

Q. When did you draw it?

A. Upon observing him stopping and making a half turn.

Q. Did you observe anything else about the man?

A. It appeared that there was an object in his right hand.

Q. Did you draw your revolver at that time?

A. That is when I drew my revolver.

---

**2.** Plaintiff Haislah testified in some detail that he had been thoroughly searched when he went out on the porch. (See Appendix A.) Defendant Walton never denied the search. Walton was, however, asked by his counsel whether he had any reason to search Haislah when Haislah first "came to the door." To this question Walton replied, "No, I did not." (See Appendix B.)

Q. Did you know what the object in his hand was when you drew your revolver?

* * * * * *

A. At that point I didn't know what it was. I assumed it was a knife by the way Mr. Haislah was posed and keeping in mind the fact that it had come across the radio that there were males with guns and knives.

Q. When you drew your revolver, was your vision still impaired?

* * * * * *

A. When I drew my revolver, the vision in my left eye was impaired.

As a matter of fact, my left eye was just about closed at this time.

Q. Did you have any concern when you drew your revolver?

A. My concern mainly was for myself. I couldn't particularly rely upon my partner because, like I said, she was an inexperienced officer, and she was to follow my lead, and if I didn't tell her to do something, she would not do it, and I felt at the same time that Mr. Haislah, whatever he had in his hand, that he was able to inflict bodily harm, knowing that he had already been violent, and I drew my revolver, and there was no time to examine my options.

I couldn't see to my left, and there was nothing to my right, and I saw nothing I could run to, and I couldn't wait and see what he was going to do, and at that point, at this point I felt I had to make a quick decision, and also I said a prayer, something to the effect, "God, he has something in his hand, and I hope I make the right decision," and that is when I fired, and I fired with the express intent of wounding him.

I did not want to kill him, and if I did, it only meant a matter of raising my sights up a couple of inches. I could place the bullet through the heart or head.

My concern was stopping him from doing something to myself or my partner, so I aimed for the lower part of the body.

Q. Why didn't you wait and find out what was in Mr. Haislah's hand before pulling your revolver?

* * * * * *

A. Had I waited to find out what was in his hand, I may not be here today, or my partner.

* * * * * *

Q. Did there come a time when you found out what was in Mr. Haislah's hand?

A. After Mr. Haislah fell to the ground, and I ran to him, I discovered what he had in his hand was in fact a knife.

* * * * * *

Q. I will ask the witness to examine that exhibit, and I will ask him—Officer Walton, are you able to identify Defendants' Exhibit Q?

A. Yes, sir.

Q. Would you identify it?

A. This is the knife that I placed my foot on and later picked up on the night of October 15, that the Defendant had had—that Mr. Haislah had.

On cross-examination, defendant Walton testified as follows:

Q. Officer, is it also so that you did not fire your weapon at Mr. Haislah because he was escaping your apprehension of him for that arrest that you had made?

* * * * * *

A. Let me make sure I understand the question.

The question is, I didn't fire because he was running away from me?

Q. That is correct.

A. The answer to that is that I did not fire at him because he was running away from me, no.

Two doctors testified by deposition read to the jury concerning the location of the bullet wound. Dr. Malgieri, one of the physicians who performed surgery on plaintiff Walton after the shooting, indicated that the bullet had penetrated the area of plaintiff's lower back:

Q. Were you able to ascertain, up to that point, where the entrance wound of the bullet was?

A. The entrance wound was in the back, on the right side.

Q. Doctor, do the records reflect where the wound was?

A. The records state that the wound was in the region of L5, S1.

Q. Can you tell us what that means?

A. That is the fifth lumbar vertebrae and first sacral vertebrae.

Q. And can you tell us approximately where that location is on the back, in layman's terms?

A. In layman's terms, it is around the beltline, I think is probably the best way to say it.

Q. This was on which side of the body?

A. The right side.

Dr. Mars, who examined plaintiff approximately a year and a half after the shooting, added the following:

Q. Doctor, were there any other objective findings based on your examination of 3/26/79?

A. The examination essentially was restricted to the neurologic system. As I told you, I did make an effort to determine the point of entry of the bullet.

Q. Did you determine that?

A. I noted on examination of Mr. Haislah's back that at the level L5 S1, just about in the midline, that there was an area of increased skin pigmentation. When asked, Mr. Haislah reported that was the entry point.

I attempted to feel for the bullet fragments in the anterior abdominal wall, but was not successful in finding it.

Q. Now, when you mentioned "midline" what do you mean by that?

A. In the mid portion of the back.

Q. Could you tell us approximately where L5 S1 was located on Mr. Haislah in regard to the waistline?

A. It would be approximately two to three inches below the waistline.

On this evidence, after receiving a lengthy charge from the District Judge, the jury found in favor of all of the defendants.

## II. THE JURY INSTRUCTIONS

■ The District Judge's charge to the jury was lengthy and obviously carefully prepared. Nonetheless, we find it so strongly slanted toward the defendants as to require reversal for new trial. The following portions of the charge appear to us to misstate the law, both federal and state as to the limited circumstances under which a police officer may with impunity shoot a person in the back.

■ We recognize that as an appellate court we are required to judge the charge as a whole and to affirm the jury verdict if, taken as a whole, it fairly presents the law as it applies to the case at hand. *See Laugesen v. Anaconda Co.*, 510 F.2d 307, 315 (6th Cir. 1975); *Tyree v. New York Central Railroad*, 382 F.2d 524, 527 (6th Cir.), *cert. denied*, 389 U.S. 1014, 88 S.Ct. 589, 19 L.Ed.2d 659 (1967).

We also recognize, of course, that the portions of the charge we quote below are only a small portion of an otherwise well prepared charge. However, as we will show, the following portions of the charge are critical to the principal issues of this case, and the errors may well have misled this jury.

### A. Deadly Force to Capture a Fleeing Misdemeanant

Both at trial and on appeal, defendant Walton has sought to justify the shooting under one theory and one theory only—self-defense. As quoted above, he specifically denied that he had shot plaintiff because plaintiff was a fleeing criminal. Yet the fleeing criminal justification was inserted into the case by the District Judge:

> The Court charges you, as a matter of law, that in Ohio deadly force is never justified to prevent a misdemeanor or to apprehend a misdemeanant, except when suppressing a riot. Deadly force may, however, be used to prevent a felony or to apprehend a felon.

In any case, ladies and gentlemen of the jury, only *such force* may be used *as is necessary under the circumstances* prevailing at the time.

It is the conduct of the parties during and at the time of the involvement of the incident giving rise to the claims of the plaintiff that join the issues in this case. After an incident has occurred it is usually easy to see how those incidents could have been avoided; but the breach of duty by Walton, if any, in using excessive force, as charged in this action, is not a matter to be judged after the occurrence of the alleged incidents and circumstances but rather under the circumstances and conditions confronting Officer Walton at the time of the incidents, taking into consideration Officer Walton's characteristics, his knowledge or lack of knowledge of the circumstances and conditions surrounding him at the time, and whether the Defendant Walton had reasonable grounds for an honest belief that he or his partner were in imminent danger of receiving great bodily harm or being killed.

Stated another way, in assessing the reasonableness or unreasonableness of force used by Officer Walton under the existing conditions and circumstances, *the rule does not require that in retrospect the amount of force used must actually have been necessary. Rather, it is sufficient if Walton had reasonable cause to believe and did believe in good faith that the force used was necessary.*

Thus, if Officer Walton had reasonable cause to believe and did believe in good faith that *the force used was necessary under the conditions and circumstances existing and confronting him at the time here in issue, he was justified to use such force without regard to whether the use of such force arose from incidents involving either a misdemeanor or a felony.*

(Emphasis added.)

In a remarkably similar case, this court held that it was

reversible error for the court to give instructions which [left] the way open for a jury to consider a question that has been suggested or mentioned during the trial which is not at issue or is not supported by the evidence. *Fleming v. Husted*, 164 F.2d 65 (8th Cir. 1947).

*Jackson v. Crockarell*, 475 F.2d 746, 748 (6th Cir. 1973) (per curiam).

In *Jackson*, the plaintiff's husband was shot and killed by a police officer. As in the case at hand, the only justification raised by the officer was that he acted in self-defense. Nevertheless, the trial court instructed the jury not only on self-defense but also on the use of deadly force to arrest a fleeing felon. As a result, this court reversed the verdict for the officer.

By twice referring to the use of deadly force in connection with misdemeanors and felonies, and by repeatedly referring to force "necessary under the circumstances" without saying what the force was necessary for, the District Judge created the likelihood that the jury would understand the fleeing criminal justification for the use of deadly force to be part of the case. The lone reference in the passage above to defendant Walton's belief concerning the imminence of great bodily harm or death to his partner or himself was not enough to dispel that likelihood.

Moreover, the last paragraph quoted above could easily have led the jury to believe that the use of potentially fatal force for the purpose of recapturing a misdemeanant was "justified" under both state and federal law. This conclusion is completely erroneous. Indeed, the District Judge earlier in his instruction had said, "[I]n Ohio deadly force is never justified to ... apprehend a misdemeanant ...." The subsequent instruction could have confused the jury as to which instruction prevailed. It could, alternatively, have been read by them as authorizing gunfire in order to recapture a misdemeanant who had broken away from arrest. This is not the law either of Ohio or this Circuit. *State v. Foster*, 60 Ohio Misc. 46, 62, 396 N.E.2d 786 (Common Pleas 1979) (quoting 1 (Interim Topics) Ohio Jur.3d Arrest § 51); *Jones v. Penketh*, 31 Ohio N.P. (n.s.) 161 (Common

Pleas 1933); *Risher [Rischer] v. Meehan*, 11 Ohio C.C. 403 (Cir.Ct.1896); *Hayes v. Memphis Police Department*, 571 F.2d 357, 358 (6th Cir. 1978) (per curiam), *aff'd after remand*, 634 F.2d 350 (6th Cir. 1980); *see Clark v. Carney*, 71 Ohio App. 14, 42 N.E.2d 938 (1942).

 Additionally, the fourth paragraph quoted above could have convinced the jury that if defendant "in good faith" believed that gunfire was necessary, his subjective judgment on that score was sufficient to exonerate him[3] for purposes of civil damages. The law is otherwise:

> [W]hether a police officer must respond in damages for his actions is judged by whether his conduct was reasonable, considering all the circumstances, and by whether he acted in good faith. A police officer's stated good faith belief in the necessity or wisdom of his action is not dispositive of that element of the defense, but must be supported by objective evidence.

*Glasson v. City of Louisville*, 518 F.2d 899, 909 (6th Cir.), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975). *Cf. Wood v. Strickland*, 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975) (immunity of school officials); *Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974) (immunity of state executive officials and state national guardsmen); *Wolfel v. Sanborn*, 555 F.2d 583, 590–92 (6th Cir. 1977) (immunity of parole officers).

### B. The "Presumption" of Regularity

We also find fault with the following instruction:

The mere fact that the evidence in this case may have established that Defendant Walton shot the plaintiff, which resulted in his injury, is not in and of itself proof that the defendant acted beyond his lawful authority under State or other law, ordinance, regulation, rule or custom. The jury should keep in mind, and the Court charges as a matter of law, that the Defendant Walton had the lawful authority to enforce existing State and local laws to insure the public safety and welfare and to protect himself from physical harm during the administration of his official duties. And unless the evidence in the case leads the jury to a different or contrary conclusion, the presumption is that the law has been obeyed.

Again, this could have been taken by the jury, for all practical purposes, as instruction to find for defendant. The charge that "Defendant Walton had the lawful authority to enforce existing State and local laws to insure the public safety and welfare and to protect himself from physical harm" is of course completely accurate. There is, however, no reference to the crucial issue in this case, which is whether some testimony relating to Walton's self-defense claim excused the otherwise illegal use of gunfire to recapture a misdemeanant.

 More important, the instruction incorrectly placed the burden of proof on the question of defendant Walton's immunity squarely on plaintiff. But, as the Supreme Court recently stated, "the burden is on the official claiming immunity to demonstrate

---

3. The District Judge instructed the jury that if it returned a verdict in favor of defendant Walton, it "need not deliberate further." This clearly implied that the absence of Walton's liability meant that (1) no constitutional violation had been committed and (2) the City of Cleveland also was not liable. In a case such as this one, where self-defense is the asserted justification for deadly force, the implication would appear to be true. When the asserted justification is the apprehension of a fleeing felon, however, the exoneration of the police officer does not necessarily settle the constitutionality of his conduct or the liability of his governmental employer. *See Garner v. Mem-*

*phis Police Department*, 600 F.2d 52, 54–55 (6th Cir. 1979); *Landrum v. Moats*, 576 F.2d 1320, 1327 (8th Cir.), *cert. denied*, 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978). *Compare Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (local units of government are "person[s]" within meaning of § 1983 and subject to liability) (overruling in part *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)), *with Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (local units of government are not entitled to the qualified immunity available to defendants who are individuals).

his entitlement." *Dennis v. Sparks*, 449 U.S. 24, 29, 101 S.Ct. 183, 187, 66 L.Ed.2d 185 (1980). *Accord, Wolfel v. Sanborn*, 666 F.2d 1005, 1006–07 (6th Cir. 1981); *Landrum v. Moats*, 576 F.2d 1320, 1329 (8th Cir.), *cert. denied*, 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978).

 Police employment of gunfire to effect the capture of a citizen who is fleeing from the law can, of course, be justified in some circumstances. It is justifiable to prevent the escape of a person known to the officer to have committed or be in the process of committing a felony involving violence.[4] It is justifiable, also, on self-defense grounds if the fleeing person by his or her actions endangers the life or limbs of the pursuing officer. The real issue in our instant case is whether or not the jury believed defendant's evidence that plaintiff threatened his (Walton's) life or safety or believed plaintiff's evidence that he was simply running away. That issue should have been presented clearly. Since it was not, we reverse and remand for a new trial.

### APPENDIX A

Q. Where did you first see the police officers?

A. As they were coming to my door.

Q. Did they eventually come to your door?

A. Yes.

Q. What happened when they came to your door?

A. Well, actually, they asked me, "Is this where the police was called?" and I said, "Yes," so they asked me to go out on the porch.

Q. Did you come out on the porch?

A. Yes.

Q. What is the first thing that happened?

A. They searched me.

Q. How?

A. They put me against the wall to search me by my legs and around my waistband.

Q. Where did this happen—on the porch? Where were you standing?

A. I was standing by the door.

Q. And where did they touch you when they searched you?

A. They searched me all over.

Q. O.K.; and who was it searched you, which of the officers?

A. Walton and Lucas.

### APPENDIX B

Q. Are you aware of the police regulations or have knowledge of the police regulations with respect to searching or frisking a civilian?

---

**4.** As discussed above, the fleeing felon rule should not have been interjected in the judge's charge in this case. Defendants have not defended this action on the ground that Haislah was a felon or that Walton had reasonable grounds for believing that he was. Nor would this record sustain that contention. Ohio does not distinguish between assaults on police officers and assaults on others. For punching Walton in the face, Haislah would at most have been guilty of "assault," a misdemeanor of the first degree carrying a maximum six-month penalty and $1,000 fine. Ohio Rev. Code Ann. § 2903.13 (Page) (1975). He would also have been guilty of "resisting arrest," but this too is a minor offense, a misdemeanor of the second degree costing at most 90 days and $750. *Id.* § 2921.33. Thus, this case does not present the issue as to whether it is lawful under the United States Constitution to use deadly force to apprehend a felon whose offense did not in-

volve the use of potentially deadly violence. *See generally Garner v. Memphis Police Department*, 600 F.2d 52 (6th Cir. 1979); *Wiley v. Memphis Police Department*, 548 F.2d 1247 (6th Cir.), *cert. denied*, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977); *Qualls v. Parrish*, 534 F.2d 690 (6th Cir. 1976); *Beech v. Melancon*, 465 F.2d 425 (6th Cir. 1972) (per curiam), *cert. denied*, 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973); *Jones v. Marshall*, 528 F.2d 132 (2d Cir. 1975); *Mattis v. Schnarr*, 547 F.2d 1007 (8th Cir. 1976) (en banc), *vacated as moot per curiam sub nom. Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977); Mogin, *The Policeman's Privilege to Shoot a Fleeing Suspect; Constitutional Limits on the Use of Deadly Force*, 18 Am.Crim.L.Rev. 533 (1981); Comment, *Deadly Force to Arrest: Triggering Constitutional Review*, 11 Harv.C.R.–C.L.L. Rev. 361 (1976).

A. Yes.

Q. When are you entitled to do a frisk or search?

\* \* \*

A. I can search a civilian after I have made an arrest, a legal arrest.

Q. And did you have any reason to search Mr. Haislah when he came to the door on the night that you arrived?

A. No, I did not.

Q. Was he under arrest at the time he came to the door?

A. No, he was not.

CORNELIA G. KENNEDY, Circuit Judge, dissenting.

I respectfully dissent. The majority identifies two parts of the instruction which it feels unduly prejudiced the plaintiff. In examining these disputed provisions of what the majority itself describes as a well-prepared charge, I find that, taking the instructions as a whole, the District Judge adequately apprised the jury of the relevant considerations to weigh in reaching a verdict. I would therefore affirm the judgment of the District Court and deny recovery to plaintiff.

At the outset, I feel constrained to point out some factual inaccuracies in the majority's presentation of the case. The majority concludes that the officers in fact searched the plaintiff immediately upon arriving at the scene. However, that is merely the plaintiff's version of what occurred. Police officer Walton's testimony indicates that no search of the plaintiff took place at any time prior to the shooting. The jury clearly believed this defendant's version of the

shooting and the events preceding it. It is not our place to substitute our evaluation of the evidence for that of the trier of fact. Additionally, the plaintiff did not only admit that while escaping he turned to observe the pursuing officer, he did not deny that at the time of the shooting he had his arm raised and cocked over his head. When asked if he had, his answer was that he did not know.

It must also be reiterated that the key issue in this case was not whether the police officer shot plaintiff in order to apprehend a fleeing misdemeanant; rather, the sole and crucial issue was whether the police officer reasonably believed, both subjectively and objectively, that he was justified in shooting the plaintiff in self-defense. The police officer never attempted to justify the shooting on any basis except self-defense.

The majority's first criticism of the charge is not well-founded. See Op. at 212–213. The majority argues that this part of the charge was in error when it mistakenly permitted the jury to find fatal force justified in recapturing a misdemeanant. But, as the majority itself notes, the defense was one of self-defense, not the justifiable apprehension of a criminal. The majority does argue that this instruction could have permitted the jury to exonerate the officer if the officer believed gunfire was necessary to recapture the fleeing plaintiff. I disagree that the jury could have so misunderstood the import of the charge. While it is perhaps unfortunate that the trial court mentioned the apprehension of a fleeing felon or a misdemeanant at all, the jury could not have understood this instruction, given its context, to suggest what the majority fears it did.[1]

---

1. The Court's charge to the jury, understood in context, dispels any doubt that the jury could have misunderstood the focus of the inquiry.

The Court charges you, as a matter of law, that in Ohio deadly force is never justified to prevent a misdemeanor or to apprehend a misdemeanant, except when suppressing a riot. Deadly force may, however, be used to prevent a felony or to apprehend a felon.

In any case, ladies and gentlemen of the jury, only such force may be used as is neces-

sary under the circumstances prevailing at the time.

It is the conduct of the parties during and at the time of the involvement of the incident giving rise to the claims of the plaintiff that join the issues in this case. After an incident has occurred it is usually easy to see how those incidents could have been avoided; but the breach of duty by Walton, if any, in using excessive force, as charged in this action, is not a matter to be judged after the occurrence of the alleged incidents and circum-

Justifiable recapture of a criminal was simply not a part of this case and the majority's attempt to read that issue into the instruction is unfair.

Similarly, it is unfair to characterize the District Judge's instruction as permitting exoneration of defendant based solely on defendant's subjective judgment on the necessity of gunfire. The instruction mandated the jury take into consideration all of the factors which confronted the officer at the time of the shooting in order to assess properly the reasonableness of the officer's actions.[2]

The majority also criticizes another portion of the near-fifty page charge which, they again claim, unfairly prejudiced the plaintiff's case. However, the portion of the instruction cited by the majority belies their claims:

> The jury should keep in mind, and the Court charges as a matter of law, that the Defendant Walton had the lawful authority to enforce existing State and local laws to insure the public safety and welfare *and to protect himself from physical harm during the administration of his official duties.* And unless the evidence in the case leads the jury to a different or contrary conclusion, the presumption is that the law has been obeyed.

App. at 56 (emphasis supplied). Hence, the majority's statement that "there is . . . no reference to the crucial issue in this case which is whether some testimony related to Walton's self-defense claim excused otherwise illegal use of gunfire to recapture a misdemeanant," is not supported by the trial court's charge. While it may have been preferable for the court to emphasize further that self-defense was the crucial element of the case, I am confident that the jury understood that to be the determining

> stances but rather under the circumstances and conditions confronting Officer Walton at the time of the incidents, taking into consideration Officer Walton's characteristics, his knowledge or lack of knowledge of the circumstances and conditions surrounding him at the time, *and whether the Defendant Walton had reasonable grounds for an honest belief that he or his partner were in imminent danger of receiving great bodily harm or being killed.*
>
> Stated another way, in assessing the reasonableness or unreasonableness of force used by Officer Walton under the existing conditions and circumstances, the rule does not require that in retrospect the amount of force used must actually have been necessary. *Rather, it is sufficient if Walton had reasonable cause to believe and did believe in good faith that the force used was necessary.*
>
> Thus, if Officer Walton had reasonable cause to believe and did believe in good faith that the force used was necessary under the conditions and circumstances existing and confronting him at the time here in issue, he was justified to use such force *without regard to whether the use of such force arose from incidents involving either a misdemeanor or a felony.*

App. at 53–5 (emphasis supplied). The majority can only rely on the first paragraph quoted above to support its assertion that the jury confused the issues of self-defense and apprehension of a criminal. The remainder of the charge, however, more than compensates for this first paragraph. Thus, the majority's reliance on *Jackson v. Crockarell*, 475 F.2d 746 (6th Cir. 1973) (per curiam) is equally inapposite for here there was no authentic instruction on the use of deadly force. It is clear to me that the jurors understood that they were to evaluate the necessity of using force to repel what the officer reasonably believed to be an "imminent danger of receiving great bodily harm . . . ."

2. Stated another way, in assessing the reasonableness or unreasonableness of force used by Officer Walton under the existing conditions and circumstances, the rule does not require that in retrospect the amount of force used must actually have been necessary. Rather, *it is sufficient if Walton had reasonable cause to believe* and did believe in good faith that the force used was necessary. App. at 54 (emphasis supplied). Three paragraphs later the court continued:

> Thus, even though a police officer may not have elected the wisest or most reasonable course of action, such police officer should not be liable if his conduct is based on a *reasonable* and good faith belief that his response was necessary under the facts and circumstances then and there existing. *However, a police officer's stated good faith belief in the necessity or wisdom of his undertaken course of action is not dispositive of that element of the defense but must be supported by some objective evidence.*

App. at 55–6 (emphasis supplied).

218

factor after reviewing the charge as a whole.[3]

The final sentence of the above-quoted charge did not act to place the burden of disproving immunity on plaintiff. It only informed the jury that the mere occurrence of the shooting at issue should not be taken to be evidence of improper police conduct. *See app.* at 57–9, *quoted supra,* at n.3. Elsewhere the court instructed on the burden of proof.[4]

For the reasons stated here, I disagree with the majority's characterization of the jury instructions. Accordingly, I dissent.

3. Such a conclusion is further bolstered by the court's summation of its charge:

Accordingly, if the jury finds from a preponderance of the evidence in the case that the Defendant Walton acted within the bounds of his lawful authority under State or other law at the time and place alleged, then the jury should return a verdict in favor of the Defendant Walton; for, as previously stated, unless the Defendant Walton acted outside the limits of his lawful authority under State or other law, ordinance, rule, regulation or custom, *or used greater force than would have reasonably appeared to have been necessary under like and similar circumstances in order to accomplish the lawful purpose intended,* then the defendant did not deprive the plaintiff of any liberty without due process of law, and the jury shall return a verdict for the Defendant Walton and need not deliberate further.

If, however, the jury concludes from a preponderance of the evidence that the Defendant Walton acted beyond the bounds of his lawful authority under color of State law, municipal ordinance, regulation, rule or custom, at the time and place alleged, *or used greater force on plaintiff than was reasonably necessary under like or similar circumstances in order to accomplish the lawful purpose intended, or acted as he did toward the plaintiff not to perform his lawful duty but was prompted by another unlawful motive,* then in that event the jury may find that the Defendant Walton did, without due process of law, deprive the plaintiff of liberty secured to him and protected by the Constitution and laws of the United States; and the jury shall then proceed to consider and decide the liability of the city and its police department, if any, arising from the training and/or supervision, or lack thereof, afforded Defendant Walton in preparing him for his duties as a police officer, *including his training, or lack thereof, in the use of deadly force,* as alleged in the plaintiff's complaint.

App. at 57–9 (emphasis supplied).

4. In a civil action the person who asserts that certain facts exist must prove those facts by a preponderance of the evidence. This obligation is known as the burden of proof.

Thus, in this case the burden of proof is upon the plaintiff to initially prove by a preponderance of the evidence all of his assertions that, one, Defendant Walton knowingly shot and wounded him as alleged in his complaint; and, two, Defendant Walton then and there acted under color of some state law, ordinance, regulation or custom of the city and/or its police department; and, three, Defendant Walton's act and conduct deprived the plaintiff of his constitutional right not to be denied or deprived of his liberty or civil rights without due process of law, as those terms are defined and explained in these instructions; and, four, the Defendant Walton's acts and conduct were the proximate cause of injury and damage to the plaintiff.

\* \* \* \* \* \*

While the burden of proof rests upon the party who asserts the affirmative of an issue to prove the claim by a preponderance of the evidence, this rule does not require such degree of proof as produces absolute certainty, since in human affairs absolute certainty is seldom possible.

\* \* \* \* \* \*

An inference is a reasonable deduction of fact which logically follows from other facts established by the evidence. The existence of an inference or presumption does not change or shift the burden of proof from one party to another. The inference or presumption must be weighed along with all the evidence to determine if the issue to which it applies has been established by a preponderance of the evidence.

App. at 41–4.