Milan CHONICH and Carmen Pascaretti, Plaintiffs–Appellees, Cross–Appellants,

v.

WAYNE COUNTY COMMUNITY COLLEGE, Defendant–Appellant, Cross–Appellee.

Nos. 87–1595, 87–1632.

United States Court of Appeals, Sixth Circuit.

Argued July 22, 1988.

Decided May 12, 1989.

---

Kirk, McCargo & Arbulu Samuel E. McCargo (argued), Detroit, Mich., for defendant-appellant, cross-appellee.

Sue E. Radulovich (argued), Detroit, Mich., for plaintiffs-appellees, cross-appellants.

Before MARTIN and WELLFORD, Circuit Judges; and JARVIS *, District Judge.

WELLFORD, Circuit Judge.

This dispute concerns an employment discrimination action under 42 U.S.C. § 1983 and Michigan's Elliott–Larsen Civil Rights Act, and a slander claim brought by former administrators at a community college. Defendant Wayne County Community College (Wayne) appeals from a jury verdict for plaintiffs, and plaintiffs cross-appeal the district court's directing of a verdict for an individual defendant on the pendent state defamation claim.

I.

In early 1984 plaintiffs, Milan Chonich and Carmen Pascaretti, white males, held exempt (non-union) administrative positions at Wayne. Chonich was Director of Development, and Pascaretti was Administrative Director of Student Services Systems. They were longtime employees whose competence in their positions had not been previously challenged. In February 1984, Dr. Waters, the then Wayne President, and the college administration submitted to the Board of Trustees a revised budget proposal, which called for a reduction in costs necessitating layoffs and the temporary closings of three Wayne campuses. Several days later, defendant Juanita Ford, a black female, Secretary of Wayne's Board of Trustees, wrote a letter (not on Wayne's stationery) regarding the revised budget to a local official of the National Association for the Advancement of Colored People (NAACP), with copies to seventeen other public figures, including state legislators. Ford's letter stated, among other things: "This is a systematic elimination of jobs which are primarily held by blacks and women.... The so called budgetary prob-

lem is a subterfuge being utilized to eliminate jobs held by blacks and women.... The position eliminations were compiled overtly and covertly by the following white males...." Ford's letter then listed Pascaretti and Chonich along with five other administrators. The letter also noted the "striking appearance of racism and sexism." Defendants have not demonstrated that Chonich and Pascaretti were on the committee submitting the revised budget.

Shortly thereafter, President Waters wrote a letter to the Board of Trustees stating his understanding of the facts regarding the layoffs and essentially repudiating the contents of Ford's letter. In approximately April, 1984, however, plaintiffs filed a defamation suit in Wayne County Circuit Court. No final disposition was reached in state court. At about this same time President Waters was receiving pressure from state legislators, recipients of Ford's letter to discharge plaintiffs. There was testimony at trial that Waters also received similar pressure from some members of Wayne's Board of Trustees and a monitor appointed by the Michigan legislature as well. In the summer of 1984, Waters reassigned each of the plaintiffs to non-exempt positions: Chonich to the position of Assistant Provost and Pascaretti to the position of "Acting" Dean but he was relieved of most job duties. Both plaintiffs made requests to the President for transfer to the faculty in accordance with asserted rights set out in their contracts with Wayne. Dr. Waters approved these requests, but did not submit his approval to the Board for action because his informal polling of Board members showed that the Board would not approve the requests. Waters, in any event, did not submit these transfer requests to the Board. There was evidence that some members were aware of these requests.

Plaintiffs filed this suit in March, 1985 in district court claiming violation of Title VII, 42 U.S.C. § 1983, and Michigan's Elliott–Larsen Civil Rights Act, charging discrimination by reason of their race (white).

* The Honorable James H. Jarvis, United States District Court for the Eastern District of Tennes-

see, sitting by designation.

In the summer of 1985, both plaintiffs refused to accept proposed early retirement plans in consideration for dropping the pending lawsuits. In the fall of 1985, Dr. Ronald Temple became Wayne's new President. He promptly issued a reorganization plan under which the positions to which plaintiffs had been reassigned were eliminated. Plaintiffs once again requested and were again denied transfers to the Wayne faculty. Pascaretti was subsequently terminated in June 1986. Chonich was demoted to the position of Assistant Dean for Academic Affairs.

Although plaintiffs' initial complaint in district court contained only discrimination claims, by the time of pretrial conferences, the parties to the litigation recognized that plaintiffs also were claiming that defendants Wayne and Ford, as originally charged in their state court suit, had defamed them. The district court, on the day that the trial was scheduled to begin, ordered plaintiffs to amend their complaint to include the defamation claims and allowed the parties additional limited discovery on these claims. Plaintiffs voluntarily dismissed their Title VII claims prior to the commencement of trial. After a continuance for further discovery purposes and a trial, the jury returned verdicts for both plaintiffs and awarded damages in the total amount of $875,000. The district court entered judgment against Wayne, but dismissed defendant Ford by directed verdict from the action based on a finding of qualified privilege and/or immunity. Wayne appeals the jury verdict against it and plaintiffs cross-appeal the district court's dismissal of Ford.

## II.

■ Defendants argue that there was procedural error to their detriment in allowing the defamation claim to be pursued together with the discrimination claim. A last minute amendment was permitted in this regard because the claim arose out of the same conduct and circumstances as the § 1983 claim and the Elliott–Larsen Act claim. The defamation claim itself has long been known to the defendants, and a prior pendant claim is permitted where there is an underlying and substantial federal cause of action involved. We find no reversible error therefore in the action of the district court to permit plaintiffs' pursuit of their defamation/libel claim at the same time and in the same forum with their discrimination causes of action.

Defendant's counsel in proceedings before Judge Gilmore on August 19, 1986, following pretrial, stated that "at the final pretrial, ... the Court indicated that she [plaintiffs' counsel] should not be pursuing both [the state and federal defamation claims] at the same time, at the final pretrial, *it was agreed* that she would pursue her libel and slander claim here and not pursue it in State Court." Joint Appendix 186 (emphasis added). If it were indeed "agreed" that plaintiffs would dismiss the state claims and pursue those claims instead in this action in federal court, it is difficult to understand defendant's claim of prejudicial error in permitting plaintiffs to proceed on this basis.

## III.

We next consider claims made against the individual defendant, Juanita Ford, Secretary of Wayne's Board of Trustees.

### A. *Defamation/Libel*

■ The district court dismissed defendant Juanita Ford from this lawsuit, apparently on the grounds that she enjoyed a *privilege* to make communications on a matter of public concern, with respect to what she at least arguably perceived as potential civil rights violations at Wayne. Plaintiffs argue that the dismissal was erroneous because, although the existence of privilege is a matter of law, abuse of privilege is a question for the jury. Plaintiffs claim that under the holding of *Rouch v. Enquirer & News of Battle Creek*, 427 Mich. 157, 398 N.W.2d 245 (1986), they needed only to raise a triable question as to whether Ford was negligent (in contrast to proving her actions malicious) in publishing the allegedly defamatory letter in order to get the defamation claim before the jury.

In *Rouch* the Michigan Supreme Court replaced the common-law public interest privilege in defamation cases with the standard established in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974): a communication is not privileged when its subject involves a private person in the context of a matter of public interest if the private-person plaintiff can show that the communication was false and was negligently published. Therefore, the plaintiff need not show malice on the publisher's part in such a circumstance in order to impose liability. *Rouch*, 427 Mich. at 200–06, 398 N.W.2d at 264–67. Although *Rouch* did not so hold expressly, the Michigan Court of Appeals has interpreted the decision as applying only to private-person plaintiffs. *Deitz v. Wometco West Michigan TV*, 160 Mich.App. 367, 407 N.W.2d 649, 653 (1987). Whether or not plaintiffs are private persons under *Rouch* is a question that must be decided before the principles of that case come into play. *See Bichler v. Union Bank & Trust Co. of Grand Rapids*, 745 F.2d 1006 (6th Cir.1984) (applying Michigan law).

Without deciding that complex question, we believe, however, that under the circumstances of this case, even if plaintiffs are required to prove actual malice or reckless disregard for the truth as to defendant Ford, it was error for the court to dismiss Ford based on her claim of privilege. "Actual malice is defined as knowledge that the published statement was false or as reckless disregard as to whether the statement was false or not." *Grebner v. Runyon*, 132 Mich.App. 327, 347 N.W.2d 741, 744 (1984). Furthermore, "reckless disregard" requires a finding that "the publisher in fact entertained serious doubts concerning the truth of the statements published." *Id.* Ford made no effort to eliminate plaintiffs among the persons she charged with an evil intent to discriminate as racists and sexists, who had allegedly proposed actions to "eliminate jobs held by blacks and women." She failed to clarify or withdraw her assertedly false charges

against plaintiffs published in her February 29, 1984 letter at any time. Ford made little, if any, effort to investigate or to rectify this charge as to plaintiffs at any time, the effect of which she had every opportunity to know would bring about serious adverse effects on the plaintiffs' positions at Wayne.

In this case, as in *Timmis v. Bennett*, "[w]hether the proofs were sufficient to support a finding of malice presented a question that plaintiff was entitled to have submitted to the jury." 352 Mich. 355, 89 N.W.2d 748, 755 (1958). It is for the court to determine first whether defendants had a privilege; "[i]t then remains for the jury, under proper instructions, to pass upon the maintenance or the destruction of the privilege." *Lawrence v. Fox*, 357 Mich. 134, 97 N.W.2d 719, 725 (1959). *Abuse* of the claimed privilege is generally a jury question. *Id.*, 97 N.W.2d at 724.

With regard to the defamation claim, we are mindful that the same individual parties were previously involved in a defamation case finally decided less than two years before the statement in controversy made by Ford against the same two plaintiffs here. In the prior case, Chonich and Pascaretti and others sued Ford for an alleged slander uttered against them in 1980 for impropriety in respect to transfer of college funds. This statement was made by Ford at a meeting of the Wayne Board. The Michigan Court of Appeals sustained a judgment for defendant because she had spoken in "one of the *rare* situations in which Michigan law recognizes an absolute privilege." *Chonich v. Ford*, 115 Mich.App. 461, 321 N.W.2d 693, 695 (1982) (emphasis added).[1] One of the three such rare situations was speech during proceedings of a legislative body, and the meeting of the Wayne Board was held to be such a legislative proceeding.

The very existence of the prior lawsuit, the outcome of which is not controlling in this case, would give some implication of "bad blood" and previous bitter controver-

---

**1.** The other two bases for recognizing an absolute privilege involved speech and "communication during judicial proceedings, and communication by military officers." *See* Newell, *Slander and Libel* § 351 (4th ed.); *see also Raymond v. Croll*, 233 Mich. 268, 206 N.W. 556 (1925).

sy between the parties involving what plaintiffs claimed was an earlier false accusation made against them by Ford. This would bear on the question of "malice" if Ford were entitled only to qualified immunity.

Upon careful examination of the record we find the district court has also improperly sustained a number of questions directed to defendant Ford going to her motives directly related to the question of malice. She admitted: "I felt that the blacks were really getting the raw deal and this is why the letter was written." Trial Transcript at 867.

The prior *Chonich v. Ford* decision is not dispositive here because Ford did not make her charge against plaintiffs during the course of a Board meeting nor at any legislative proceeding. There is a factual question as to whether she made the statement in her personal capacity or as secretary of the Board of Trustees with or without apparent authority.[2] We find *Ford v. Chonich* not controlling, as asserted by defendant in her brief to the district court.

We REVERSE and REMAND on the basis that a jury question was created regarding whether Ford was within her privilege in making her comments in controversy.

## B. *Immunity*

■ The charge also made against Ford, acting on her own behalf and as agent for Wayne, was that she had intentionally and/or recklessly discriminated against plaintiffs because of their race by accusing them falsely of racism and sexism. The plaintiffs after submitting proof dismissed their employment discrimination claim against Ford. We find for the reasons stated, however, that Ford enjoyed no absolute immunity. It would ordinarily be a jury question as to whether her letter was written in her official capacity and while acting within the scope of her duty as Secretary. Originally, defendants took differing positions in their responses to the complaint about whether, at the pertinent

time, Ford "acted as Secretary not as an individual."

In *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1981) (citing *Gravel v. United States,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972)), it was stated:

The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action.

We REVERSE, therefore, the action of the district court in dismissing plaintiffs' slander and discrimination claim against Ford based on the latter's defense of immunity, and we REMAND for further proceedings.

## IV.

We now turn to issues raised regarding Wayne's liability and the jury instructions.

## A. *Libel/Defamation*

■ Plaintiff claims the district court erred when it ruled as a matter of law that the libel count against Wayne should be dismissed as a matter of law.

We concluded that Ford was not, as a matter of law, privileged or immune from liability for issuing the allegedly false and libelous statement that they were discriminating intentionally and covertly against blacks and females. Plaintiffs contend that Wayne is liable because Ford was acting as agent for Wayne in so doing, and that the Board did not repudiate it. Plaintiffs rely on *Paledna v. Bendix Aviation Corp.,* 360 Mich. 129, 139, 103 N.W.2d 789, 794 (1960), that it is a jury question as to whether Wayne is bound by Ford's actions as Secretary of its Trustees as to whether

---

2. In an affirmative defense, Ford asserted that she acted "solely in her capacity as an interested citizen and member of the NAACP." She also claimed that her statement about plaintiffs was "true and accurate."

her alleged libel came about "in relation to the matter about which [her] duty as agent permits or requires [her] to act." A corporation in Michigan has been held liable for slanderous remarks of its employees and agents while acting in their normal employment capacity. *See Haddad v. Sears Roebuck and Co.*, 526 F.2d 83 (6th Cir.1975); *Jones v. Sears Roebuck and Co.*, 459 F.2d 584, 587 (6th Cir.1972); *Sias v. General Motors*, 372 Mich. 542, 127 N.W.2d 357 (1964). In its answer, defendant Wayne stated that Ford "acted at all times relative to the matters set forth in the Plaintiffs' complaint, within the scope of her duty as secretary." We hold that it was error to dismiss Wayne from the defamation claim under the circumstances.

In view of our holding on defamation as to defendant Ford, we REMAND on this issue for the district court to determine whether on agency principles Wayne may be held liable for alleged defamation and libel.

B. *Employment Discrimination*

Defendant Wayne claims prejudicial error in respect to the following portion of the charge to the jury regarding Wayne's potential liability:

The law provides that an employer shall not discriminate against a person regarding employment, compensation, or a term, condition or privilege of employment because of race or sex.

. . . .

The discrimination must have been intentional. It cannot have occurred by accident. Intentional discrimination means that one of the motives or reasons for Plaintiffs' discharge or failure to be promoted or failure to be transferred to faculty or harassment or demotions were based on race and sex. Race and sex do not have to be the only reason, or even the main reason, but a person's race and sex has to be one of the reasons which made a difference in determining whether or not to discharge, hire, promote, demote, harass, or transfer the Plaintiffs.

. . . .

The Plaintiffs claim that Defendant discriminated against them by failing to transfer, promote, and demoted them because of their race or sex and by discharging one Plaintiff because of race or sex.

. . . .

As I say, their claim is that they were not transferred, promoted or demoted or fired because of race or sex or in retaliation for their having filed lawsuits.

It is unlawful for an employeer to fail to promote, transfer or demote or otherwise discriminate against a person because of that, against an employee because of that employee's race or sex.

Because it is usually difficult to prove that an action has been taken against an employee because of his race or sex, the courts have developed rules for evaluating the evidence in a given case. The rules provide for a three-step procedure. In the first step, the aggrieved party, the party claiming to be discriminated against, first must prove by a preponderance of the evidence and carry the burden of proof to prove:

1. That he applied for and was qualified for the job;.

2. That even though he was qualified, he was rejected;.

3. After his rejection for promotion or transfer, the position was filled by a person of the opposite sex or race;.

4. That he or she was demoted or discharged or retaliated against because of the lawsuit he brought and an equivalent person of the opposite sex or race was not.

If the aggrieved person establishes each of these elements, which the aggrieved person must do first, the employer must then come forward and produce evidence of legitimate nondiscriminatory reasons for its action. If the employer produces evidence of legitimate nondiscriminatory reasons, the aggrieved party, or Plaintiffs, must then prove by a preponderance of the evidence, carry the burden of proof, that the reasons given were a pretext for discrimination.

Thus, in this case in order to prevail on their claim that the Defendant failed to promote, transfer and demoted them because of race or sex and discharged them because of race or sex or in retaliation for the institution of a lawsuit, the Plaintiffs must first prove by a preponderance of the evidence:

1. That they applied for and were qualified for the job or faculty or other exempt positions.

2. That even though they were qualified, they were rejected.

3. That after their rejection, Blacks were allowed to transfer to faculty and were hired in the exempt positions they then applied for;.

4. That they were subsequently discharged;.

5. That no comparable black or female was discharged.

Then, if you find that the Plaintiffs have established each of these elements in their claim, you must consider the Defendant's stated reasons for not promoting, transferring or for demoting or discharging Plaintiffs. If you find the Defendant has produced evidence of a legitimate non-discriminatory reason for refusing to promote, transfer the Plaintiffs, and then demoting and discharging them, Plaintiffs cannot prevail unless the Plaintiffs prove then by a preponderance of evidence that the reasons given by the Defendant were a pretext for discrimination. In other words, Plaintiffs must then prove by a preponderance of the evidence that discriminatory reasons more likely motivated the Defendant than the legitimate reasons offered or that the explanations offered by the Defendant simply are not believable.

An appellate court must review jury instructions as a whole to determine whether the charge adequately informs the jury of the relevant considerations in the case and provides a basis in law for assisting the jury in its decision. The reviewing court should affirm the jury's verdict unless the instructions, viewed as a whole, were confusing, misleading, and prejudicial. *See Kitchen v. Chippewa Valley Schools*, 825 F.2d 1004, 1010 (6th Cir.1987); *Haislah v. Walton*, 676 F.2d 208, 212 (6th Cir.1982). Only if the charge insufficiently or misleadingly instructs the jury on an issue crucial to the jury's determination of the dispute, should we set aside a jury verdict. *See Gomez v. Great Lakes Steel*, 803 F.2d 250, 257 (6th Cir.1986).

The district court sought to instruct the jury regarding the shifting burden of proof standards articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). An instruction incorporating this standard has been approved but is not absolutely required by this court. *See Kitchen*, 825 F.2d at 1012.

We are not satisfied that the instruction given was not misleading, confusing, or inadequate in stating the requirements of burden of proof or burden of persuasion imposed upon the parties in a case of this kind. There was some intermingling of the claims of direct racial discrimination and those of retaliation. This may have been sufficient to constitute error.

■ The more serious problem in the instructions given relates to the implications of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), in this case. Defendant Wayne requested an instruction based on *Monell* to the effect that a municipal or state entity to be held liable for unlawful discrimination or other wrongful activity by its agents within the meaning of § 1983, must be shown to he acted under color of state law and in accordance with "official policy," sanction, or custom.[3] No such in-

---

**3.** Plaintiffs themselves requested an instruction styled "state action" (# 12) that a state college may be held liable only if plaintiff proves injuries that were caused by "some *policy* ... or decision *officially adopted* by the Defendant College," or by "persistent governmental *custom* of the College;" or by "an ... official or agent who had the final authority to take the action...." (Emphasis added).

struction was given, and we must consider carefully the conduct involved to determine whether the jury must necessarily have found this standard to apply in this case to the actions of Wayne. Defendant Wayne in its brief indicated that the Elliott–Larsen state claim may be based on vicarious liability unlike the federal claim. "Elliott–Larsen appears to contain definition language regarding 'agents' which implies respondeat superior. See MCC, 37.2201(a); and *Jenkins v. American Red Cross*, 141 [Mich.App.] 785 [369 N.W.2d 223] (1985)." Brief for appellants at 19.

We consider this problem in the instructions despite plaintiffs' position that "[d]efendants proposed no jury instruction with respect to the question of *respondeat superior* and, they objected only to the Court's refusal to give a 'Color of Law' instruction." Brief for Appellee at 16. Plaintiffs concede, however, that the issue was raised in the district court "post-trial" but in a "cursory fashion." We believe the issue is properly raised, however, and must be considered in light of appropriate jury instructions as to the law that even plaintiffs proposed as bearing on Wayne's liability under § 1983 and/or the Elliott Larsen Act. *See* Joint Appendix 196 (proposed instruction on "municipalities", No. 16).

The instructions given by the court on the claim of discrimination do not mention "official policy" or "custom and practice," or actions sanctioned, adopted, approved, or authorized by Wayne through its responsible officials or Board. The district court deemed, under the proof, that actions taken by or involving the presidents of the College and its directors of personnel were official and sanctioned actions of Wayne; they were Wayne "personified."

Michigan courts have expressly relied on federal precedent regarding proof of employment discrimination for purposes of the Elliott–Larsen Civil Rights Act. *Jenkins v. Southeastern Michigan Chapter, American Red Cross*, 141 Mich.App. 785, 369 N.W.2d 223, 237 n. 2 (1985). Elliott–Larsen provides a cause of action for retaliation following the filing of a discrimination claim, while it may be questionable that

§ 1983 creates a substantive right against such retaliation. *See Day v. Wayne County Board of Auditors*, 749 F.2d 1199 (6th Cir.1984). Wayne argues therefore that separate instructions on the two parallel but different causes of action should have been given. The district court also did not use separate instructions for the federal and the state claims of employment discrimination.

We are troubled by the district court's failure to set out in its instructions the specifics of the § 1983 claim as to "official policy" requirements and to distinguish the § 1983 from the Elliott–Larsen claim with regard to respondeat superior and to certain important particulars. To sustain the jury verdict for plaintiffs we would have to conclude that it necessarily incorporates a finding that defendant Wayne, through its responsible officials and agents, rejected plaintiffs as administrators and faculty members because of their race, and that defendant Wayne failed to produce satisfactory economic or academic reasons for its alleged discriminatory actions. It is a close and difficult question that there was a basis for a judgment for plaintiffs against Wayne because of its demotion and discharge for racial reasons under § 1983 and/or under Elliott–Larsen. *See Pembaur, supra; Gilmere v. City of Atlanta*, 737 F.2d 894, 902 n. 22 (11th Cir.1984); *Ponton v. Newport News District*, 632 F.Supp. 1056 (E.D.Va.1986). We also note particularly the Court's recent decision of *City of Canton v. Harris*, —— U.S. ——, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) citing approvingly an earlier remand by this court of a § 1983 case because the jury instruction "might have led the jury to believe that it could find against the city on a mere *respondeat superior* theory." *Id.* at ——, 109 S.Ct. at 1201. Therefore, we REMAND the case to the district court for further consideration as to whether a new trial on these liability issues is required because of the absence of *Monell* instructions.

## V.

Wayne contends that "inflamatory issues" were permitted to go before the jury

"which denied the Defendant WCCC [Wayne] a fair trial." Brief of Appellants at 8. We have discussed the allowing of an amendment adding the defamation issues at the outset of trial, and we found no reversible error in this procedure under the circumstances.

■ One of the errors charged was allowing Drs. Waters and Callaghan, Wayne's former president and personnel director, to be examined as adverse or hostile witnesses. This contention was coupled with an alleged deprivation of discovery to pursue their deposition testimony concerning the discrimination issues involved. Again, we find this action of the district court not to constitute reversible error. Nor do we find it error to have allowed this testimony, allegedly detrimental to defendant Wayne, after defendant had first moved for directed verdicts during trial and the court reserved judgment thereon. Waters and Callaghan had been very high officials at Wayne during the period in question. They were among those charged by defendant, directly or indirectly, with having taken actions which amounted to racial or sexual discrimination, although perhaps acting under pressure from defendant Ford and others who testified about the backlash created by Ford's charges contained in her letter written as Secretary of the Board of Trustees. Drs. Waters and Cavanaugh were subject to discovery by Wayne during the original discovery period in this case when their allegedly discriminatory acts were at issue. They were not charged with being a part of or associated with Ford's alleged libel and defamation against plaintiffs. The limitation of subsequent discovery by the district court did not constitute reversible error.

■ The district court designated Drs. Waters and Callaghan as witnesses identified with an adverse party under F.R.E. 611(c) and allowed plaintiffs' counsel to use leading questions on direct examination. Such use of leading questions during direct examination falls within the trial court's sound discretion, and an appellate court should not intervene once a trial court has exercised its supervisory authority unless there has been a clear abuse of that discretion. *United States v. Shoupe*, 548 F.2d 636, 641 (6th Cir.1977). Defendant has not made such a showing in this case. The case cited by defendants as authority for their position, *Shaklee Corp. v. Gunnell*, 748 F.2d 548 (10th Cir.1984), involved what was found to be an abuse of discretion in precluding discovery about a large part of the proof in the case. We find it distinguishable on the facts of this case. Finally, defendant has not convincingly demonstrated that the district court's denial of defendant's motion for an enlargement of time for motion practice before trial unfairly prejudiced defendant.

In sum, we find no basis for a new trial based upon the other procedural errors asserted by defendants on appeal.

## VI.

Defendant Wayne contends that the verdicts and judgments in the total amount of $875,000 are clearly not supported by the evidence presented by plaintiffs or either of them. We examine separately the damages awarded to each plaintiff.

### A. *Milan Chonich*

■ Chonich was awarded $375,000 in actual damages and $25,000 in punitive damages despite remaining employed by Wayne after the episodes in controversy. He received a salary of $48,495 during the 1984–85 school year and the year following. Chonich claimed a loss in salary and a loss of fringe benefits after July 1986. The amount of future damages was necessarily difficult to establish, but it is evident that the amount of the compensatory award to Chonich is excessive and based upon speculation and conjecture.

Dr. Richard Shaw testified for plaintiffs on the nature and extent of the wage and economic loss involved, but he concluded his testimony which indicated several million dollars in potential loss by stating that he was "simply [giving] numbers that reflect present value," and he conceded that his testimony does not "mean anything in terms of what actual damages are." Dr.

Shaw made no reference to a duty to mitigate damages. Dr. Shaw's figures for damages ignored the fact that plaintiff or plaintiffs continued to be employed and, indeed, any element of mitigation of damages nor any element of work life expectancy. Also, the expert assumed a faculty salary considerably higher than what either plaintiff had ever earned and much greater than the average salary levels at Wayne. He ignored the fact that Chonich had previously been notified of a potential lay-off. We doubt the effectiveness and relevance of such purported expert testimony in light of these circumstances. The district court, moreover, gave no instruction to the jury on reduction of damages in the form of future wage losses to present value. Dr. Chonich acknowledged, moreover, that "there was a deficit situation at the College for the last year" before this controversy came into being. He considered enrollment was declining and that "we always had a deficit situation from the early 1980's on." [4] Chonich, moreover, in light of these fiscal problems confessed in his testimony to "some uncertainty" about his future "status in that particular job" at Wayne before this controversy arose. In 1987, when he testified, Chonich stated that he was demoted in 1984 and was receiving about $5,000 annually less than his former salary and this continued into 1987, although he continued to feel "insecure" in his reassigned position. He also testified to losing certain insurance and fringe benefits and to loss of reputation. Trustee Zimmerman indicated that she believed Chonich was teaching undergraduate courses at another university. Trial Transcript at 400.

We have decided, together with most other circuit courts, that "there should be appellate supervision over the size of jury verdicts." *Rodgers v. Fisher Body Division, GMC,* 739 F.2d 1102, 1106 (6th Cir. 1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 821 (1985); 6A Moore's *Federal Practice* ¶ 59.08[6] (2d ed. 1981). Such review is appropriate where the verdict appears to be excessive. *Rodgers,* 739 F.2d at 1106. "[A]n award of future damages must be reduced to present value in order to take into account the earning power of the money." *Rodgers,* 739 F.2d at 1106; *Chesapeake & Ohio Ry. Co. v. Kelly,* 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916); *Petition of U.S. Steel Corp.,* 436 F.2d 1256, 1280 (6th Cir.1970), *cert. denied sub nom. Lamp v. U.S. Steel,* 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971). Plaintiffs argue that defendant made no special request for such an instruction; defendant counters that it anticipated that the district court would include the reduction to present value instruction as part of its standard charge. A post-trial motion for remittitur was made and denied. In any event, "the prospect of a future decline in the purchasing power of the dollar may not be used to offset the reduction [in a damage award for loss of future earnings] to present value." *Petition of U.S. Steel Corp.,* 436 F.2d at 1280; *see also Steeman v. Chesapeake & Ohio Ry. Co.,* 414 F.2d 305 (6th Cir.1969). The failure to instruct the jury to reduce to present value any reasonably demonstrated loss of future earnings fatally infects this jury award. As in *Rodgers,* we find the omission in this case to be "plain error," *Rodgers,* 739 F.2d at 1106, although juries are given "great discretion in determining the amount of damage awards." *Rodgers,* 739 F.2d at 1107; *see also Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). Also, as in *Rodgers,* we must set aside a damage award, which is based on speculation and is unconscionably excessive, particularly where plaintiff's damage claims were based on a faculty compensation figure beyond the normal levels as established virtually without contradiction.

Dr. Waters was not named by plaintiffs as a party defendant. Chonich claims that he sought to transfer to a faculty position in 1984, which involved potentially higher pay, but it seems doubtful that the Board of Wayne itself acted on the 1984 request

4. Chonich conceded that in 1983 finances of Wayne were "unstable," and that declining enrollment was a "major factor." Chonich also admitted that in the years 1982–84 there were also "projected deficits" and that this was "public knowledge," and that "administration of the college was considered to be top heavy."

made to Waters for transfer. Dr. Waters did submit the request of plaintiff in a communication dated July 2, 1984, dealing with personnel reassignments to "all college personnel," but it is unclear as to whether the Board was included or whether the Board itself acted. Dr. Waters stated that Chonich's request for faculty status would be recommended and submitted to the Board at the "next meeting."

We must accordingly remand the matter of damages to the district court, under these circumstances, for a new trial with respect to Chonich.

### B. *Carmen Pascaretti*

■ Compensatory damages in the amount of $450,000 were awarded to Pascaretti plus punitive damages of $25,000. Defendant Wayne also challenges these awards as being excessive and unwarranted for the same reasons discussed hereinabove as to Chonich and for additional reasons. Much of what we stated concerning the award of damages to Chonich also applies to Pascaretti.

In their appellate brief, plaintiffs' counsel asserts that Wayne's "refusal ... to permit Plaintiffs' transfer to the faculty" was the "critical discriminatory act" on its part "and was at the core of Plaintiffs' compensatory damage claim." Appellants Brief at 37. Defendant contends that Dr. Waters never submitted a recommendation to Wayne's Board for such a transfer by Pascaretti. In any event, plaintiffs' claim of right to transfer involves a legal interpretation by the court of the alleged contractual basis for such a claim. We are unable to determine that the district court made such a legal finding with respect to either plaintiff.[5] If the district court determines no contractual right to transfer and such a transfer were a matter of discretion only, then this information should be considered in reaching a judgment on both liability and damages. Chonich was asked

if he knew of any exempt administrators that were denied the right to go to faculty. He responded, "I don't know of any." (Tr. at 317.) Pascaretti, however, claimed that he knew of one, Arthur Carter, a black, who had far fewer qualifications than he. (Tr. at 339.)

Pascaretti had a Masters degree in business administration from Wayne State. He claimed that he suffered a heart attack in January of 1985 due to defendant's wrongful actions despite having prior good health until the matters in controversy during 1984. He returned to his temporary position as acting dean and continued to exercise regularly after the heart attack. He claimed to have applied, after his notice of elimination of his executive administration spot, for eleven positions at Wayne but was given only one interview and was selected for none despite claimed qualifications. He claimed also to have applied, unsuccessfully, for administrative positions at many other colleges after his notice of termination. Pascaretti also testified that he was told by his supervisor that he did not have qualifications for a faculty position sought.

Plaintiff Pascaretti passed on no medical proof whatsoever presenting a causative medical basis for his alleged heart condition. It is doubtful, therefore, that this was a proper factor to consider as an alleged direct consequence of defendants' actions. Pascaretti, moreover, had been suspended without pay in 1980 and in 1983, and was proposed for a temporary lay-off in 1979, 1981 and 1982.

On cross examination, Pascaretti admitted that he was teaching part-time at Wayne and working in real estate and that he was offered the opportunity to teach additional courses. The damages in the case of Pascaretti, who was younger than Chonich and also terminated, are not as clearly excessive, but for the reasons indi-

---

5. Wayne took the position that plaintiffs' claimed right of transfer to faculty was in all events subject to approval both of the President and the Board of Trustees. Plaintiffs contend that they had "dual appointment" contracts that entitled them to transfer to faculty. This con-

troversy involves a legal question and should first be determined by the district court as a matter of law. Board Trustee Zimmerman testified that she was not aware of other administrators in comparable positions to those of plaintiffs being denied transfer upon request.

cated, however, and because of the failure to instruct the jury of the necessity of reducing to present value the loss of future earnings, we must also remand the issue of damages for Pascaretti for a new trial.

## VII.

We REVERSE the dismissal of Ford and Wayne on the defamation counts. On RE-MAND, we direct the district court to reconsider Wayne's potential for liability under *Polenda* and *Sias.* We also REMAND for further consideration by the district court the propriety of the determination of liability for employment discrimination by Wayne in light of the deficiency in the jury instructions in light of *Monell* and its progeny. Even if the district court were to determine that the instructions were sufficient, we REMAND for a new trial on plaintiffs' damages for the reasons stated.[6]

---

**6.** We do not express any opinion regarding the issues of prejudgment interest and attorney fees.